United States District Court
Southern District of Texas
**ENTERED**
September 29, 2016
David J. Bradley, Clerk

# IN THE UNITED STATES DISTRICT COURT
# FOR THE SOUTHERN DISTRICT OF TEXAS
# HOUSTON DIVISION

| | | |
|---|---|---|
| MID-CONTINENT CASUALTY CO., | § | |
| Plaintiff, | § | |
| | § | |
| v. | § | CIVIL ACTION NO. 4:09-0422 |
| | § | |
| PETROLEUM SOLUTIONS, INC., | § | |
| BILL HEAD d/b/a BILL HEAD | § | |
| ENTERPRISES, and TITEFLEX | § | |
| CORP., | § | |
| Defendants. | § | |

## AMENDED MEMORANDUM AND ORDER
## TABLE OF CONTENTS

I.    Introduction ........................................................................................................3

II.   Background ..........................................................................................................4

    A.   The Fuel Tank and the Flex Connector ..............................................5

    B.   The State Court Litigation ....................................................................6

    C.   Communications Between PSI and Mid-Continent ...........................12

    D.   Procedural Posture ...............................................................................13

III.  Legal Standard ..................................................................................................14

IV.   Analysis .............................................................................................................15

    A.   Legal Principles for Interpretation of Insurance Contracts ................15

    B.   Legal Basis of the Titeflex Judgment: Texas Civil Practice & Remedies Code § 82.002 .....................................................................18

        1.   Section 82.002:  General Legal Principles .................................18

        2.   Components of the Titeflex Judgment .......................................22

    C.   The Duty to Cooperate .......................................................................30

D.   Coverage for the Titeflex Judgment Under the Policy ......................44

1.   Policy Section I(A)(1)(b): "'Property Damage' To Which This Insurance Applies"....................................................46

a.   Property Damage .........................................................47

b.   Occurrence....................................................................52

c.   Policy Period..................................................................53

d.   Prior Knowledge of Property Damage ...........................54

e.   Professional Liability Endorsement ...............................54

f.   Conclusion on "'Property Damage' to Which This Insurance Applies"......................................................57

2.   Section I(A)(1)(a): "Damages Because of . . . 'Property Damage'" ......................................................................57

a.   Damages .......................................................................57

b.   "Because of" ..................................................................65

c.   Conclusion on Coverage for "Damages Because of . . . 'Property Damage'"................................................78

3.   Money Damages ......................................................................79

a.   Definition of "Money Damages"....................................79

b.   Coverage for Money Damages ......................................80

4.   Exclusion q...............................................................................86

5.   Public Policy ............................................................................86

6.   Conclusion on Coverage .........................................................89

E.   Texas Insurance Code ....................................................................89

F.   Section 38.001 Attorney's Fees Request ...........................................90

V.   Conclusion and Order.................................................................................91

Appendix...................................................................................................94

## I.    __INTRODUCTION__

This insurance coverage case raises various legal issues suitable for a law school examination.    Pending are the parties' cross-motions for summary judgment.   Defendant Petroleum Solutions, Inc. ("PSI") has filed a Motion for Summary Judgment ("PSI Motion") [Docs. # 62, # 63].   Plaintiff Mid-Continent Casualty Company ("Mid-Continent") responded and filed a Cross-Motion for Summary Judgment ("Mid-Continent Motion," and, with the PSI Motion, the "Motions") [Docs. # 68, # 68-1].[1]   At the Court's request, PSI and Mid-Continent each filed a supplemental brief.[2]   The Court heard argument on the Motions on June 6, 2016.   *See* Hearing Minutes and Order [Doc. # 87].

The Motions are now ripe for determination.   After carefully considering the parties' briefing, all matters of record, and the applicable legal authorities, the Court **grants in part and denies in part** the PSI Motion and **grants in part and**

---

[1]    PSI filed a combined Response to the Mid-Continent Motion and Reply in support of its Motion ("PSI Reply") [Doc. # 72].   Mid-Continent filed a Reply in support of its Motion ("Mid-Continent Reply") [Doc. # 74].   PSI filed a Motion for Leave to File Sur-Reply [Doc. # 79], with the proposed Sur-Reply attached [Doc. # 79-1].   Mid-Continent opposed this filing [Doc. # 82].   PSI's Motion is **granted**.

Mid-Continent filed Objections [Doc. # 75] to certain exhibits attached to the PSI Reply because these exhibits were not produced during the discovery period.   PSI argued in Response that Mid-Continent would not be prejudiced by the admission of these exhibits.   *See* PSI Response to Objections [Doc. # 78].   The Court concludes that Mid-Continent is not prejudiced by the exhibits.   *See infra* notes 266, 271, and accompanying text.   Mid-Continent's Objections are **overruled**.

[2]    *See* Order [Doc. # 83]; PSI Supplemental Brief [Doc. # 86]; Mid-Continent Supplemental Brief [Doc. # 85].   Following oral argument, PSI filed a Motion for Leave to File Supplemental Summary Judgment Evidence ("PSI Post-Argument Brief") [Doc. # 88], which motion the Court granted.   *See* Order [Doc. # 89]. Mid-Continent filed a Response to the Motion for Leave to File Supplemental Summary Judgment Evidence ("Mid-Continent Post-Argument Brief") [Doc. # 90].

3

**denies in part** the Mid-Continent Motion.  The Court decides as a matter of law all issues presented by the parties except the questions of whether PSI satisfied its duty to cooperate under the Mid-Continent insurance policy and several questions relating to the exact amount of Mid-Continent's coverage obligation, issues on which a trial is needed.[3]

## II.   <u>BACKGROUND</u>

The parties dispute whether a commercial general liability ("CGL") policy issued by Mid-Continent (the "Policy")[4] provides coverage for a judgment rendered against PSI in litigation in Texas state court.  The provisions of the Policy that are relevant to this dispute are excerpted in the Appendix to this Memorandum

---

[3]     The Court issued its original Memorandum and Order [Doc. # 93] deciding the Motions on July 29, 2016.  The parties subsequently moved for reconsideration on numerous issues.  PSI filed a Motion to Alter or Amend ("PSI Recon. Motion") [Doc. # 94], objecting to the Court's holdings regarding the manner in which the duty to cooperate applies to the coverage dispute at bar and limiting the scope of coverage to only a portion of the Titeflex Judgment.  Mid-Continent filed a Response ("Mid-Continent Recon. Response") [Doc. # 100], to which PSI replied ("PSI Recon. Reply") [Doc. # 101].

Mid-Continent filed a Motion to Alter or Amend ("Mid-Continent Recon. Motion") [Doc. # 99], objecting to the Court's comments on an issue of Texas surety law and asserting that the doctrine of concurrent causation bars any recovery by PSI.  Mid-Continent also asserted for the first time that public policy counsels against a finding of coverage in this case.  PSI filed a Response ("PSI Recon. Response") [Doc. # 102], to which Mid-Continent replied ("Mid-Continent Recon. Reply") [Doc. # 103].

The Court carefully considered the parties' arguments and authorities. The Court hereby **VACATES** the July 29 Memorandum and Order, and incorporates the results of its new analysis in this Amended Memorandum and Order.

[4]     Exhs. 1–1a to PSI Motion, Certified Copy of Mid-Continent Casualty Company Policy No. 04-GL-00051591 ("Policy") [Docs. # 63-2, #63-3].   All references herein to the Policy are to the Commercial General Liability Coverage Form ("CGL Form"), as amended by the Professional Liability Endorsement.  *See* Policy [Doc. # 63-2], at ECF pages 14–26, 40.

and Order ("Appendix").  The following facts are not in dispute for purposes of the Motions for Summary Judgment.

### A.     The Fuel Tank and the Flex Connector

In 1997, Bill Head ("Head") contracted with PSI to construct and install an underground fuel storage system at his Silver Spur Truck Stop ("Silver Spur") in Pharr, Texas.[5]  PSI purchased a component part for the fuel tank from Titeflex Commercial Products ("Titeflex").[6]  In October 2001, Head discovered that 20,000 gallons of fuel had seeped into the soil under the truck stop.[7]  Head attributed the damage to a leak in the fuel storage system and contacted PSI.  PSI notified Mid-Continent of the fuel spill because PSI believed any resulting liability would be covered by the Policy.[8]  PSI and Mid-Continent theorized that a flex connector manufactured by Titeflex in the fuel tank was faulty.[9]

Counsel was retained by Mid-Continent in 2002 to represent PSI in any potential litigation arising out of the fuel leak.  Counsel submitted the flex connector to an expert for testing.[10]  The expert inspected the flex connector but

---

[5]     Exh. 5 to PSI Motion, Mid-Continent Group Office Memorandum from Larry Liveringhouse to John Delaney, dated Feb. 25, 2002 [Doc. # 63-5], at 2.

[6]     *See* Exh. A6 to Mid-Continent Motion, Letter from Mark Barron to Titeflex Commercial Products, dated Jan. 22, 2002 [Doc. # 68-10].

[7]     *Petroleum Sols., Inc. v. Head*, 454 S.W.3d 482, 485 (Tex. 2014); *see* Exh. 5 to PSI Motion, Mid-Continent Group Office Memorandum from Larry Liveringhouse to John Delaney, dated Feb. 25, 2002 [Doc. # 63-5], at 2.

[8]     Exh. A2 to Mid-Continent Motion, Facsimile from Tom Barron to Jim Boam, dated Nov. 18, 2001 [Doc. # 68-6], at 2.

[9]     Exh. 5 to PSI Motion, Mid-Continent Group Office Memorandum from Larry Liveringhouse to John Delaney, dated Feb. 25, 2002 [Doc. # 63-5], at 2.

[10]    Exh. 8 to PSI Motion, Letter from Elizabeth Neally to Steve Hintze, dated Oct. 21, 2002 [Doc. # 63-10], at 1.

found no conclusive evidence that the part was defective.[11]   The expert caused the flex connector to be stored in W.H. Laboratories' storage facility, which was torn down in 2006, causing the part to be lost.[12]

### B.    The State Court Litigation

On February 13, 2006, Head filed suit against PSI in the 398th District Court of Hidalgo County (the "State Court Litigation").[13]   Head alleged claims for Breach of Warranty of Fitness, Breach of Implied Warranty of Good and Workmanlike Services, and Negligence.   Head alleged that PSI had contended that the fuel leak was caused by a faulty flex connector, but the Original Petition alleged more broadly that PSI was at fault because it sold and installed the fuel storage tank, including the flex connectors and the leak detection system.[14]   Mid-Continent assumed PSI's defense under a reservation of rights.[15]

On October 5, 2006, PSI filed a third-party action against Titeflex, which alleged that Titeflex was responsible for the failure of the fuel storage system and therefore PSI was "entitled to contribution and/or indemnity" from Titeflex (the "Affirmative Claim") under the Texas Products Liability Act, specifically,

---

[11]     Exh. A9 to Mid-Continent Motion, Letter from Elizabeth Neally to Steve Hintze, dated Apr. 9, 2002 [Doc. # 68-13], at ECF page 3.

[12]     *See* Exh. 15 to PSI Motion, Letter from John Delaney to Robert Bryant, dated Sept. 26, 2006 [Doc. # 63-17]; Exh. 16 to PSI Motion, Letter from Robert Bryant to Victor Vicinaiz, dated Sept. 26, 2006 [Doc. # 63-18].

[13]     Exh. A14 to Mid-Continent Motion, Plaintiff's Original Petition, *Bill Head v. Petroleum Sols., Inc.*, Cause No. C-416-06-I (398th Dist. Ct., Hidalgo County, Tex. Feb. 13, 2006) [Doc. # 68-18].

[14]     *See id.*, at 2–3, ¶¶ 6–11.

[15]     *See* Section II.C, *infra*, for a description of Mid-Continent's reservation of rights letters.

§ 82.002 of the Texas Civil Practice and Remedies Code ("Section 82.002").[16] Several months later, on January 30, 2007, Head filed a First Amended Original Petition, which added a strict products liability claim against Titeflex.[17]

During discovery in the State Court Litigation, on January 4, 2008, Titeflex moved for a spoliation instruction against PSI for PSI's failure to produce the flex connector.[18]   On March 7, 2008, Head non-suited his claims against Titeflex without prejudice[19] and shortly thereafter filed an amended petition that alleged claims only against PSI.[20]

In the first half of 2008, PSI and Mid-Continent debated whether to dismiss PSI's Affirmative Claim against Titeflex.   Mid-Continent had retained Victor Vicinaiz ("Vicinaiz") to represent PSI in the trial court and Jennifer Hogan ("Hogan") as appellate counsel.   Hogan also offered legal advice during the trial

---

[16]   Exh. A22 to Mid-Continent Motion, Defendant Petroleum Solutions, Inc.'s Third Party Action, *Bill Head v. Petroleum Sols., Inc.*, Cause No. C-416-06-I (398th Dist. Ct., Hidalgo County, Tex. Oct. 5, 2006) [Doc. # 68-26], at 2, § IV.  PSI references Section 82.003 in its pleading, but this appears to have been a typo. PSI's claim was treated as a Section 82.002 claim throughout the State Court Litigation.  Section 82.002 is discussed in detail in Section IV.B.2, *infra*.

[17]   Exh. A24 to Mid-Continent Motion, Plaintiff's First Amended Original Petition, *Bill Head v. Petroleum Sols., Inc.*, Cause No. C-416-06-I (398th Dist. Ct., Hidalgo County, Tex. Jan. 30, 2007) [Doc. # 68-28], at 3–4, ¶¶ 9–14.

[18]   Exh. A26 to Mid-Continent Motion, Defendant's, Titeflex Corporation, Motion for Sanctions for Spoliation of Evidence, *Bill Head v. Petroleum Sols., Inc.*, Cause No. C-416-06-I (398th Dist. Ct., Hidalgo County, Tex. Jan. 4, 2008) [Doc. # 68-30].

[19]   Exh. A28 to Mid-Continent Motion, Plaintiff's Notice of Non-Suit Without Prejudice of Third-Party/Defendant Titeflex Corporation, *Bill Head v. Petroleum Sols., Inc.*, Cause No. C-416-06-I (398th Dist. Ct., Hidalgo County, Tex. Mar. 7, 2008) [Doc. # 68-32].

[20]   Exh. A29 to Mid-Continent Motion, Plaintiff's Second Amended Original Petition, *Bill Head v. Petroleum Sols., Inc.*, Cause No. C-416-06-I (398th Dist. Ct., Hidalgo County, Tex. Apr. 7, 2008) [Doc. # 68-33].

court proceedings.[21]   After Head non-suited his claims against Titeflex without prejudice, Vicinaiz advised that PSI similarly should dismiss its Affirmative Claim without prejudice to simplify the State Court Litigation because Titeflex was "vigorously defending itself," and the defense was undercutting PSI's position vis-à-vis Head.[22]

On May 19, 2008, Titeflex filed a counterclaim against PSI (the "Titeflex Counterclaim") requesting indemnification of "costs of court, reasonable expenses, and attorney's fees arising subsequent to the entry of [Head's] Notice of Non-Suit [on March 7, 2008] which were expended in defense of this action and in prosecution of this demand for indemnity."[23]   Vicinaiz relayed to Mid-Continent and PSI that Titeflex offered to dismiss its Counterclaim if PSI dismissed its Affirmative Claim.[24]   As a result, on August 12, 2008, PSI dismissed its

---

[21]   *See, e.g.*, Exh. 17 to PSI Motion, Letter from Hogan to Robert Bryant, dated Feb. 29, 2008 [Doc. # 63-19].

[22]   Exh. A30 to Mid-Continent Motion, Letter from Vicinaiz to Robert Bryant, dated May 14, 2008 [Doc. #68-34], at 2.

[23]   Exh. A31 to Mid-Continent Motion, Original Counter Claim of Titeflex Corporation Against Petroleum Solutions, Inc., *Bill Head v. Petroleum Sols., Inc.*, Cause No. C-416-06-I (398th Dist. Ct., Hidalgo County, Tex. May 19, 2008) [Doc. # 68-33].  This type of claim is sometimes referred to as a request for "fees for fees."

Titeflex also requested recovery of "damages awarded to PSI as against Titeflex that are properly attributable to PSI's own wrongful conduct."  Titeflex subsequently abandoned this latter request.  *See infra* note 31 and accompanying text.

[24]   Exh. A32 to Mid-Continent Motion, Email from Vicinaiz to Robert Bryant and Michael A. McGurk, dated June 1, 2008 [Doc. # 68-36], at ECF page 2 ("I have spoken with Tom Cowen, the attorney for Titeflex and he has suggested that Petroleum Solutions dismiss their third party action and in turn they will dismiss their counterclaim.").

8

Affirmative Claim without prejudice.[25]   On August 13, 2008, Titeflex explained that it would only dismiss its Counterclaim if PSI would agree to mutual dismissal of their claims *with* prejudice (the "Settlement Offer").[26]   Titeflex gave PSI two days, until August 15, 2008, to accept the Settlement Offer.[27]

Vicinaiz advised Mid-Continent and PSI that PSI's dismissal of its claims against Titeflex likely disposed of the Titeflex Counterclaim because it was merely a reformulation of Titeflex's Answer to PSI's Affirmative Claim.   Titeflex maintained nevertheless that its Counterclaim remained valid despite PSI's dismissal.   Vicinaiz as well as Mid-Continent personnel urged PSI to accept the Settlement Offer.[28]   PSI decided to reject the Settlement Offer because PSI wanted to retain the option to pursue an indemnity action against Titeflex, if necessary, in light of Mid-Continent's reservation of rights regarding the defense of PSI against Head's claims.[29]

---

[25]   Exh. A36 to Mid-Continent Motion, Notice of Non-Suit, *Bill Head v. Petroleum Sols., Inc.*, Cause No. C-416-06-I (398th Dist. Ct., Hidalgo County, Tex. Aug. 12, 2008) [Doc. # 68-40].   PSI and Mid-Continent intended to continue to designate Titeflex as a responsible third party.   *See* Exh. A32 to Mid-Continent Motion, Email from Robert Bryant to Vicinaiz, dated Aug. 11, 2008 [Doc. # 68-36], at ECF page 7.

[26]   Exh. 26 to PSI Motion, Letter from Thomas A. Cowen to Vicinaiz, dated Aug. 13, 2008 [Doc. # 63-28].

[27]   *Id.*

[28]   Exh. A37 to Mid-Continent Motion, Letter from Vicinaiz to Robert Bryant, dated Aug. 12, 2008 [Doc. # 68-41]; Exh. A38 to Mid-Continent Motion, Emails between Robert Glover and Vicinaiz, dated Aug. 14, 2008 [Doc. # 68-42].

[29]   Exh. 29 to PSI Motion, Letter from Michael A. McGurk to Robert Bryant, dated Aug. 18, 2008 [Doc. # 63-31].

9

On September 15, 2008, a month after Titeflex's Settlement Offer had expired, Titeflex amended its counterclaim.[30]    As amended, the Titeflex Counterclaim asserted a Section 82.002 claim, which requested "all past and future costs of court, reasonable expenses, and reasonable and necessary attorney's fees which were expended in defense of this action and in prosecution of this demand for indemnity."[31]

The State Court Litigation proceeded to trial in September 2008 on Head and Titeflex's respective claims against PSI.  The judge instructed the jury that PSI had "destroyed, lost, or failed to produce . . . material evidence" and that the jury could presume that this evidence was unfavorable to PSI.[32]   On September 29, 2008, the jury returned verdicts in favor of Head and Titeflex.[33]   Head was awarded $1,131,321.26 in damages and prejudgment interest and $91,500.00 in attorney's fees against PSI.[34]  The jury awarded Titeflex $382,334.00 in attorneys'

---

[30]    Exh. A42 to Mid-Continent Motion, Second Amended Counter Claims of Defendant, Titeflex Corporation, Against Petroleum Solutions, Inc. ("Titeflex Amended Counter Claim"), *Bill Head v. Petroleum Sols., Inc.*, Cause No. C-416-06-I (398th Dist. Ct., Hidalgo County, Tex. Sept. 15, 2008) [Doc. # 68-46]. Although Titeflex entitled this pleading "*Second* Amended Counter Claims" (emphasis added), counsel explained at oral argument that Titeflex had not previously amended its counterclaim.

[31]    *Id.*, at 4.  Titeflex did not specifically reference Section 82.002 in its pleading, but its claim was treated as arising under that statute throughout the State Court Litigation.  *See infra* Section IV.B.2.

[32]    Exh. A46 to Mid-Continent Motion, Court's Charge to the Jury, *Bill Head v. Petroleum Sols., Inc.*, Cause No. C-416-06-I (398th Dist. Ct., Hidalgo County, Tex. Nov. 5, 2008) [Doc. # 68-50], at 4.

[33]    Exh. 4 to PSI Motion, Final Judgment, *Head v. Petroleum Sols., Inc.*, Cause No. C-416-06-1 (398th Dist. Ct., Hidalgo County, Tex. Jan. 13, 2009) [Doc. # 63-6], at 1.

[34]    *Id.*, at 3.

fees, $68,519.12 in expenses, $12,393.35 in costs, and postjudgment interest at 5% from the day of the judgment until its satisfaction (the "Titeflex Judgment").[35]

PSI appealed the judgment in favor of Head contending the trial judge's spoliation sanctions were in error.  PSI also appealed the Titeflex Judgment on the ground that Titeflex could not satisfy the requirements of Section 82.002, the statute pursuant to which it sought indemnification from PSI.[36]  The Corpus Christi Texas Court of Appeals affirmed,[37] and PSI petitioned for review by the Texas Supreme Court.  The Texas Supreme Court issued an opinion on July 11, 2014, but substituted a new opinion on reconsideration on December 19, 2014.  The Texas Supreme Court reversed the judgment in favor of Head, holding the trial court's spoliation instruction was error, and remanded for retrial on Head's claims.  The Texas Supreme Court rejected PSI's challenges to the Titeflex Judgment, finding that the erroneous spoliation instruction did not affect the verdict in favor of Titeflex.  The Texas Supreme Court accordingly affirmed the Titeflex Judgment.[38] Recently, on remand, the trial court entered summary judgment for PSI on Head's claims.[39]

---

[35]    *Id.*

[36]    *Petroleum Sols., Inc. v. Head*, 454 S.W.3d 518, 567 (Tex. App.—Corpus Christi 2011), *aff'd in part, rev'd in part*, 454 S.W.3d 482 (Tex. 2014).

[37]    *Id.*, at 579.

[38]    *See Petroleum Sols., Inc. v. Head*, 454 S.W.3d 482, 493 (Tex. 2014) ("*PSI v. Head*").

[39]    *See* Exh. B to Supplemental Joint Status Report, Order on Defendant Petroleum Solutions, Inc.'s Supplemental Motion for Summary Judgment and Motion to Reconsider, *Head v. Petroleum Sols., Inc.*, Cause No. C-416-06-1 (398th Dist. Ct., Hidalgo County June 27, 2016) [Doc. # 92-1].

### C.    Communications Between PSI and Mid-Continent

Mid-Continent sent six reservation of rights letters to PSI over the course of the State Court Litigation,[40] of which the fifth and sixth letters are relevant to the dispute at bar.  The fifth letter, which was sent on August 26, 2008, did not address specifically the Titeflex Counterclaim, but stated that "Mid-Continent reserves its right to decline any duty to PSI, including, but not limited to, PSI's failure to cooperate in our investigation and defense of this claim/suit."[41]  In the sixth letter, sent on September 19, 2008, Mid-Continent explained that its coverage position in the fifth letter applied to the Titeflex Counterclaim.[42]  Noting that Titeflex sought indemnification only of attorney's fees, costs of court, and reasonable expenses, Mid-Continent reserved the right in the sixth letter to disclaim coverage because these items "may not constitute damages because of 'property damage' or 'bodily injury' caused by an 'occurrence' as defined by the Mid-Continent Policy."[43]

After the Texas Supreme Court affirmed the Titeflex Judgment in its July 11, 2014 opinion, Mid-Continent denied coverage for the Titeflex Counterclaim on July 30, 2014.[44]  In the denial letter, Mid-Continent took the position that PSI's

---

[40]    *See* Exhs. A10, A17, A19, A33, A40, and A43 to Mid-Continent Motion [Docs. # 68-14, # 68-21, # 68-23, # 68-37, # 68-44, # 68-47].

[41]    Exh. A40 to Mid-Continent Motion, Letter from Rod Evans to Mark Barron, dated Aug. 26, 2008 [Doc. # 68-44], at 7.

[42]    Exh. A43 to Mid-Continent Motion, Letter from Rod Evans to Mark Barron, dated Sept. 19, 2008 [Doc. # 68-47], at 1 ("The Counter Claim of Titeflex Corporation against PSI is part of the suit for which Mid-Continent has presently agreed to provide coverage subject to a reservation of rights. . . .  We believe our coverage position letter of August 26, 2008 is sufficient to also address the Counter Claim of Titeflex Corporation against PSI . . . .").

[43]    *Id.*, at 1–2.

[44]    Exh. A47 to Mid-Continent Motion, Letter from Robert Glover to Mark Barron, dated July 30, 2014 [Doc. # 63-51], at 1.

12

rejection of the Settlement Offer constituted a failure of cooperation that permitted Mid-Continent to deny coverage.[45]  Mid-Continent further cited "Exclusion q" of the Policy, which excludes losses "caused intentionally by or at the direction of the insured."[46]

### D.    Procedural Posture

On February 12, 2009, Mid-Continent filed the complaint in this case seeking declaratory relief that the judgment against PSI in the State Court Litigation was not covered under the Policy.[47]  In 2010, the Court stayed the case pending completion of the state court appellate process.[48]  When the Titeflex Judgment became final after the Texas Supreme Court's December 19, 2014 decision, this Court reopened this case to resolve the coverage issues regarding the Titeflex Judgment.[49]

Mid-Continent seeks a declaratory judgment that the Titeflex Judgment is not covered by the Policy on the grounds that (1) the language of the Policy does not support a finding of coverage, (2) Exclusion q applies to the Titeflex Judgment, and (3) PSI breached a duty to cooperate with Mid-Continent when PSI rejected the Settlement Offer.[50]  PSI has counterclaimed on the grounds that Mid-Continent's denial of coverage constituted (1) a breach of contract and (2) a breach

---

[45]     *Id.*, at 4–5.

[46]     *Id.*, at 5.

[47]     Original Complaint for Declaratory Judgment [Doc. # 1].

[48]     Order [Doc. # 38].

[49]     *See* Order [Doc. # 40]; Second Amended Complaint for Declaratory Judgment [Doc. # 50], at 5, ¶ 23 ("Mid-Continent and PSI agreed to re-open this administratively closed case to adjudicate the coverage issues as to the Titeflex judgment.").

[50]     Second Amended Complaint for Declaratory Judgment [Doc. # 50], at 5, ¶¶ 24–31.

of Chapter 541 of the Texas Insurance Code.[51]  The parties now move for summary judgment on all issues.

## III.   <u>LEGAL STANDARD</u>

Rule 56 of the Federal Rules of Civil Procedure provides for the entry of summary judgment against a plaintiff who fails to make a sufficient showing of the existence of an element essential to his case and on which he will bear the burden at trial.[52]  Summary judgment "should be rendered if the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law."[53]

In deciding whether a genuine and material fact issue has been created, the court reviews the facts and inferences to be drawn from them in the light most favorable to the nonmoving party.[54]  A genuine issue of material fact exists when the evidence is such that a reasonable jury could return a verdict for the non-movant.[55]  The Court may make no credibility determinations or weigh any evidence, and must disregard all evidence favorable to the moving party that the

---

[51]   Defendant's Answer to Second Amended Complaint for Declaratory Judgment and Counterclaim [Doc. # 51], at 9–11.

[52]   *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986); *Curtis v. Anthony*, 710 F.3d 587, 594 (5th Cir. 2013); *Little v. Liquid Air Corp.*, 37 F.3d 1069, 1075 (5th Cir. 1994) (*en banc*) (*per curiam*).

[53]   FED. R. CIV. P. 56(a); *Celotex*, 477 U.S. at 322–23; *Curtis*, 710 F.3d at 594.

[54]   *Reaves Brokerage Co. v. Sunbelt Fruit & Vegetable Co.*, 336 F.3d 410, 412 (5th Cir. 2003).

[55]   *Tamez v. Manthey*, 589 F.3d 764, 769 (5th Cir. 2009) (citing *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986)).

jury is not required to believe.[56]   The Court is not required to accept the non-movant's conclusory allegations, speculation, and unsubstantiated assertions which are either entirely unsupported, or supported by a mere scintilla of evidence.[57]   Affidavits cannot preclude summary judgment unless they contain competent and otherwise admissible evidence.[58]

"When evidence exists in the summary judgment record but the nonmovant fails even to refer to it in the response to the motion for summary judgment, that evidence is not properly before the district court."[59]   "Rule 56 does not impose upon the district court a duty to sift through the record in search of evidence to support a party's opposition to summary judgment."[60]

## IV.   ANALYSIS

### A.   Legal Principles for Interpretation of Insurance Contracts

The Court has subject matter jurisdiction over this action based on complete diversity of citizenship of the parties.   The Court is bound to apply the substantive law of the forum state and follow federal procedural rules.[61]   Here, the parties agree that Texas law governs substantive issues of insurance law.

---

[56]   *Chaney v. Dreyfus Serv. Corp.*, 595 F.3d 219, 229 (5th Cir. 2010) (citing *Reaves Brokerage Co.*, 336 F.3d at 412–13).

[57]   *Id*. (citing *Reaves Brokerage*, 336 F.3d at 413); *Little*, 37 F.3d at 1075.

[58]   *See* FED. R. CIV. P. 56(c)(4); *Love v. Nat'l Med. Enters.*, 230 F.3d 765, 776 (5th Cir. 2000).

[59]   *Malacara v. Garber*, 353 F.3d 393, 405 (5th Cir. 2003).

[60]   *Id.* (internal citations and quotations omitted); *Williams v. Valenti*, 432 F. App'x 298, 302 (5th Cir. 2011).

[61]   *See Erie R. Co. v. Tompkins*, 304 U.S. 64, 78 (1938); *Hall v. G.E. Plastic Pac. PTE Ltd.*, 327 F.3d 391, 395 (5th Cir. 2003).

Under Texas law, the meaning of an insurance contract is determined under the standards applicable to contracts generally.[62] A court's primary concern is to give effect to the intention of the parties as expressed by the policy language.[63]

"If the contract is worded so that it can be given a definite meaning, it is unambiguous and a judge must construe it as a matter of law."[64]  A contract is ambiguous only "when its meaning is uncertain and doubtful or it is reasonably susceptible to more than one meaning."[65]  The determination of whether a contract is ambiguous is a question of law.[66]  Only if the contract is subject to more than one reasonable interpretation will it be deemed ambiguous and interpreted in favor of coverage for the insured.[67]

---

[62]   *See One Beacon Ins. Co. v. Crowley Marine Servs.*, 648 F.3d 258, 271 (5th Cir. 2011); *Mid-Continent Cas. Co. v. Swift Energy Co.*, 206 F.3d 487, 491 (5th Cir. 2000); *Barnett v. Aetna Life Ins. Co.*, 723 S.W.2d 663, 665 (Tex. 1987).

[63]   *Am. Nat'l Gen. Ins. Co. v. Ryan*, 274 F.3d 319, 323 (5th Cir. 2001) (citing *Ideal Lease Serv., Inc. v. Amoco Prod. Co.*, 662 S.W.2d 951, 953 (Tex. 1983)).

[64]   *Int'l. Ins. Co. v. RSR Corp.*, 426 F.3d 281, 291 (5th Cir. 2005); *Royal Indem. Co. v. Marshall*, 388 S.W.2d 176, 181 (Tex. 1965).

[65]   *Kern v. Sitel Corp.*, 517 F.3d 306, 309 (5th Cir. 2008) (quoting *Coker v. Coker*, 650 S.W.2d 391, 393 (Tex. 1983)).  "The fact that the parties disagree as to coverage does not create an ambiguity."  *Valmont Energy Steel, Inc. v. Commercial Union Ins. Co.*, 359 F.3d 770, 773 (5th Cir. 2004); *see also Gilbane Bldg. Co. v. Admiral Ins. Co.*, 664 F.3d 589, 597 (5th Cir. 2011); *Forbau v. Aetna Life Ins. Co.*, 876 S.W.2d 132, 134 (Tex. 1994).

[66]   *Am. Int'l. Specialty Lines Ins. Co. v. Rentech Steel, L.L.C.*, 620 F.3d 558, 562 (5th Cir. 2010) (citing *Kelley-Coppedge, Inc. v. Highlands Ins. Co.*, 980 S.W.2d 462, 464 (Tex. 1998)).

[67]   *Lambrecht & Assocs., Inc. v. State Farm Lloyds*, 119 S.W.3d 16, 20 (Tex. App.— Tyler 2003, no pet.) (citing *Grain Dealers Mut. Ins. Co. v. McKee*, 943 S.W.2d 455, 458 (Tex. 1997)); *see also Swift Energy Co.*, 206 F.3d at 491.

Mid-Continent requests a declaration that it did not breach the Policy's terms by declining coverage over the Titeflex Judgment.  PSI counterclaims that Mid-Continent breached that contract.[68]  In Texas,

> The essential elements of a breach of contract action are: (1) the existence of a valid contract; (2) performance or tendered performance by the plaintiff; (3) breach of the contract by the defendant; and (4) damages sustained by the plaintiff as a result of the breach.[69]

There is no dispute that the Policy is a valid contract.  The parties' disputes center on the other contract claim elements.  They dispute whether PSI failed to cooperate with Mid-Continent and thus breached the contract's cooperation clause.[70]  The parties also proffer competing interpretations of various provisions of the Policy.[71]  The parties do not dispute that, if Mid-Continent is found to have breached the terms of the Policy, PSI suffered damages, but the parties disagree on the amount of coverage due.  Foundational legal analysis is necessary to rulings on the contract issues.

The Court first addresses the legal basis of the Titeflex Judgment.  The Court then concludes that the cooperation clause applies to PSI's conduct in declining the Titeflex Settlement offer of mutual dismissal with prejudice, but determines that genuine issues of material fact exist regarding whether PSI breached that duty.  The Court also concludes that the Policy provides indemnity to

---

[68]   *See* Defendant's Answer to Second Amended Complaint for Declaratory Judgment and Counterclaim [Doc. # 51], at 9.

[69]   *Smith Int'l, Inc. v. Egle Grp.*, 490 F.3d 380, 387 (5th Cir. 2007) (quoting *Valero Mktg. & Supply Co. v. Kalama Int'l, L.L.C.*, 51 S.W.3d 345, 351 (Tex. App.—Houston [1st Dist.] 2001, no pet.)).

[70]   *See infra* Section IV.C.

[71]   *See infra* Section IV.D.

PSI for a portion of the Titeflex Judgment and that the remainder of the parties' arguments lack merit.

### B. Legal Basis of the Titeflex Judgment: Texas Civil Practice & Remedies Code § 82.002

This case presents a question of first impression: Does a CGL policy provide coverage for a judgment against a manufacturer for loss incurred in meeting its statutory obligation under Section 82.002 of the Texas Civil Practice and Remedies Code,[72] which requires manufacturers to indemnify an innocent seller for losses incurred by the seller in a products liability action.  A brief review of the language and purpose of Section 82.002 provides essential context.

### 1. Section 82.002:  General Legal Principles

Titeflex obtained its Judgment pursuant to Section 82.002.  The parties and state trial court did not specify which subsections were implicated.

***Section 82.002(a).***— Section 82.002(a) creates the primary cause of action for an innocent seller to obtain indemnity from a manufacturer.  Section 82.002(a) provides:

> A manufacturer shall indemnify and hold harmless a seller against loss arising out of a products liability action, except for any loss caused by the seller's negligence, intentional misconduct, or other act or omission . . . for which the seller is independently liable.

A "products liability action" is "any action against a manufacturer or seller for recovery of damages arising out of personal injury, death, or property damage allegedly caused by a defective product whether the action is based in strict tort liability, strict products liability, negligence, misrepresentation, breach of express

---

[72]   Texas Products Liability Act § 82.002, TEX. CIV. PRAC. & REM. CODE § 82.002 (eff. Sept. 1, 1993).

or implied warranty, or any other theory or combination of theories."[73]   A "manufacturer" is "a person who is a designer, formulator, constructor, rebuilder, fabricator, producer, compounder, processor, or assembler of any product or any component part thereof and who places the product or any component part thereof in the stream of commerce."[74]   A "seller" is "a person who is engaged in the business of distributing or otherwise placing, for any commercial purpose, in the stream of commerce for use or consumption a product or any component part thereof."[75]   As clarified by the Texas Supreme Court in the underlying dispute between PSI and Head, under Section 82.002, "an innocent seller who suffers loss is protected regardless of whether it is upstream or downstream of [the] product's manufacturer."[76]

> The Texas Supreme Court explained the purpose of Section 82.002 in 1999:
>
> Viewed in context, section 82.002 is a part of a scheme to protect manufacturers as well as sellers of products.  First, the new law ensured that the relatively small seller need not fear litigation involving problems that are really not in its control.  Second, it established uniform rules of liability so that manufacturers could make informed business decisions and plaintiffs could understand their rights.[77]

The enactment of Section 82.002 altered allocation of responsibility for losses attributable to products liability actions under Texas law.  "Under the common

---

[73]   *Id.*, § 82.001(2).   "[A] 'products liability action' includes not only products liability claims but also other theories of liability properly joined thereto, such as [an] allegation of negligence . . . ."  *Meritor Auto., Inc. v. Ruan Leasing Co.*, 44 S.W.3d 86, 91 (Tex. 2001).

[74]   TEX. CIV. PRAC. & REM. CODE § 82.001(4).

[75]   *Id.*, § 82.001(3).

[76]   *PSI v. Head*, 454 S.W.3d at 494.

[77]   *Fitzgerald v. Advanced Spine Fixation Sys., Inc.*, 996 S.W.2d 864, 868–69 (Tex. 1999).

19

law, a manufacturer was not required to indemnify a seller of its products 'unless and until there was a judicial finding of negligence on the part of the manufacturer.'"[78]  After enactment of Section 82.002, however, the manufacturer became the seller's indemnitor when an injured person or entity makes an *allegation* against the seller.[79]  The manufacturer owes the seller the indemnity even if the manufacturer is ultimately not found liable.[80]  Under Section 82.002(b), "'loss' includes court costs and other reasonable expenses, reasonable attorney fees, and any reasonable damages."

In *General Motors Corp. v. Hudiburg*, the Texas Supreme Court also explained in 2006 that a party may be both a manufacturer and seller.[81]  This situation arises when one party manufactures an item that it sells to another party who uses that item as part of a product.  In that circumstance, the first party is a component-product manufacturer and the second is a finished-product

---

[78]   *Toyota Indus. Equip. Mfg., Inc. v. Carruth-Doggett, Inc.*, 325 S.W.3d 683, 687 (Tex. App.—Houston [1st Dist.] 2010) (quoting *Owens & Minor, Inc. v. Ansell Healthcare Prods. Inc.*, 251 S.W.3d 481, 483 (Tex. 2008)); *see also Humana Hosp. Corp. v. Am. Med. Sys., Inc.*, 785 S.W.2d 144 (Tex. 1990).

[79]   *Gen. Motors Corp. v. Hudiburg*, 199 S.W.3d 249, 256 (Tex. 2006) ("The duty to indemnify is triggered by the injured claimant's pleadings.").  Losses for which the seller is held independently liable are excluded from the manufacturer's indemnification obligation.  Unlike the manufacturer's indemnification obligation, which is triggered by *allegations*, this exception only applies if there is an adjudication on the *merits* that the seller was liable.  *PSI v. Head*, 454 S.W.3d at 492 (citing *Meritor Auto., Inc. v. Ruan Leasing Co.*, 44 S.W.3d 86, 91 (Tex. 2001)).

[80]   Section 82.002(e)(1) provides that this duty "applies without regard to the manner in which the action is concluded."  Further, the duty "is in addition to any duty to indemnify established by law, contract, or otherwise."  TEX. CIV. PRAC. & REM. CODE § 82.002(e)(1).

[81]   *Hudiburg*, 199 S.W.3d at 256 ("By [the] definitions [in Section 82.001], all manufacturers are also sellers, but not all sellers are manufacturers.").

manufacturer.   The Texas Supreme Court has explained that the manufacturer-seller relationship is bi-directional in this situation:

> [T]he manufacturer of a component product alleged by a claimant to be defective has a duty to indemnify an innocent seller/manufacturer of a finished product which incorporates the component from loss arising out of a products liability action related to the alleged defect, but the manufacturer of an allegedly defective finished product has a duty to indemnify the innocent seller/manufacturer of a component product for the same loss.[82]

If an injured person or entity asserts claims against both the component-part and finished-product manufacturers, the manufacturers may assert competing Section 82.002(a) claims against each other.   Where two parties pursue competing Section 82.002(a) claims, "the burden will ultimately fall on the party whose product is found to be defective."   If neither product is defective, both Section 82.002(a) claims fail.[83]

*Attorney's Fees Under Section 82.002(g).*— Section 82.002(g) authorizes fee-shifting for an innocent seller who successfully prosecutes an indemnity claim under Section 82.002(a).  Section 82.002(g) provides:

> A seller is entitled to recover from the manufacturer court costs and other reasonable expenses, reasonable attorney fees, and any reasonable damages incurred by the seller to enforce the seller's right to indemnification under this section.

---

[82]   *Id.*

[83]   *PSI v. Head*, 454 S.W.3d at 494; *see also Hudiburg*, 199 S.W.3d at 256–57 ("If neither the component-product manufacturer nor the finished-product manufacturer is innocent, depending not on allegations but on proof, both indemnity claims under the statute will fail.  If both are innocent, again depending on proof, the indemnity claims offset each other.").

2.    **Components of the Titeflex Judgment**

*PSI and Titeflex's Section 82.002(a) Claims.*— Head's Original Petition asserted claims only against PSI.[84]  PSI asserted a Section 82.002(a) claim against Titeflex based on its contention that a flex connector manufactured by that company caused the leak.[85]  Head then amended his Petition to name Titeflex as a co-defendant and added allegations that Titeflex was responsible for the fuel leak.

Eventually, Head non-suited his claims against Titeflex.  Titeflex then filed a counterclaim against PSI seeking attorney's fees incurred subsequent to Head's non-suit of Titeflex.[86]  Titeflex subsequently amended its counterclaim to include all fees and costs incurred from the time PSI filed its Affirmative Claim on October 5, 2006, including the period in which Head had a direct claim against Titeflex.[87]

---

[84]    *See* Exh. 14 to Mid-Continent Motion [Doc. # 68-18].

[85]    PSI pleaded its claim pursuant to "Section 82.003" of the Texas Civil Practice and Remedies Code, "Liability of Nonmanufacturing Sellers," which provision states the elements a claimant must prove to hold a seller who did not manufacture a product liable for injury caused by the product.  *See* Exh. A22 to Mid-Continent Motion, Defendant Petroleum Solutions, Inc.'s Third Party Action, *Bill Head v. Petroleum Sols., Inc.*, Cause No. C-416-06-I (398th Dist. Ct., Hidalgo County, Tex. Oct. 5, 2006) [Doc. # 68-26], at 2, § IV.  It appears that PSI intended to plead a claim pursuant to Section 82.002 and PSI's claim was treated as such in the State Court Litigation. PSI alleged it and Head should recover all "damages" (which PSI did not specify) under products liability law.  *Id.*, at 3.

[86]    Exh. A31 to Mid-Continent Motion, Original Counter Claim of Titeflex Corporation Against Petroleum Solutions, Inc., *Bill Head v. Petroleum Sols., Inc.*, Cause No. C-416-06-I (398th Dist. Ct., Hidalgo County, Tex. May 19, 2008) [Doc. # 68-33].

[87]    Titeflex Amended Counter Claim [Doc. # 68-46].

In this case, Titeflex, a component-product manufacturer, and PSI, a finished-product manufacturer,[88] were "both manufacturers and sellers *vis-à-vis* each other,"[89] and both asserted Section 82.002 claims.  However, only Titeflex pursued through trial its Section 82.002(a) claim for losses incurred in the State Court Litigation.[90]  For purposes of Section 82.002(a), the existence of allegations by Head against Titeflex was sufficient to sustain a judgment in favor of Titeflex as seller-indemnitee against PSI as manufacturer-indemnitor for attorney's fees and expenses incurred as a result of the Head claims against Titeflex.[91]  In addition, Section 82.002(g) permitted Titeflex to recover additional attorney's fees, expenses and costs incurred through trial on the Section 82.002(a) claim as a "seller" for indemnity against PSI, the "manufacturer."[92]  The evidence submitted to the jury in

---

[88]   The Texas Supreme Court held in *PSI v. Head* that the fuel tank was a "product." *See* 454 S.W.3d at 494–95.

[89]   *Id.*, at 494.

[90]   *See* Exh. A36 to Mid-Continent Motion, Notice of Non-Suit, *Bill Head v. Petroleum Sols., Inc.*, Cause No. C-416-06-I (398th Dist. Ct., Hidalgo County, Tex. Aug. 12, 2008) [Doc. # 68-40].

[91]   There was no evidence at trial that Titeflex was independently liable for the damage to Head.  The only questions submitted to the jury in the State Court Litigation regarding the Titeflex Counterclaim were: (1) "Is Petroleum Solutions, Inc. a manufacturer?"; (2) "Is Titeflex Corporation a seller?"; (3) "What is a reasonable fee for the necessary services of the attorneys for Titeflex Corporation in this case, stated in dollars and cents?"; and (4) "What amount, if any, in expenses were reasonably incurred by Titeflex Corporation in this lawsuit?"  *See* Exh. A46 to Mid-Continent Motion, Court's Charge to the Jury, *Bill Head v. Petroleum Sols., Inc.*, Cause No. C-416-06-I (398th Dist. Ct., Hidalgo County, Tex. Nov. 5, 2008) [Doc. # 68-50], at 32–34 (Questions 13–16).

[92]   *See* Titeflex's Amended Counter Claim [Doc. # 68-46], at 4 ("Titeflex is entitled to recover from PSI all past and future costs of court, reasonable expenses, and reasonable and necessary attorney's fees which were expended in defense of this action *and in prosecution of this demand for indemnity*." (emphasis added)); Final Judgment, Exh. A44 to Mid-Continent Motion [Doc. # 68-48], at 3 (awarding (continued…)

the State Court Litigation and the Titeflex Judgment compensated Titeflex for its attorney's fees, expenses and costs incurred as a result of litigation of three claims: (1) defense against Head's products liability claims; (2) defense against PSI's Affirmative Claim under Section 82.002(a); and (3) prosecution against PSI pursuant to Section 82.002(g) for recovery of Titeflex's Section 82.002(a) indemnity claim.  The Titeflex Judgment did not segregate these components. Analysis of coverage under the Policy requires consideration of each component separately.

*Defense Against PSI's Affirmative Claim as a Component of the Titeflex Judgment.*— As noted, in addition to the loss suffered by Titeflex in defending against Head's claims (component (1) above), the Titeflex Judgment includes attorney's fees, expenses and costs that Titeflex incurred in defending against PSI's Affirmative Claim asserted under Section 82.002(a) (component (2) above). PSI asserted its claim for indemnity against Titeflex on October 5, 2006, before Head asserted his direct claims on January 30, 2007, and PSI did not non-suit that claim until mid-August 2008, more than five months after Head dismissed his Titeflex claims in March.  PSI's State Court Litigation counsel, selected and advised by Mid-Continent, did not object in the Texas trial court to the inclusion of Titeflex's losses related to defense against PSI's Section 82.002(a) claim in the evidence of attorney's fees, expenses and costs submitted to the jury.  On appeal, PSI unsuccessfully sought to challenge that portion of the Titeflex Judgment based on these fees.  The Texas Court of Appeals held that PSI had waived the issue.[93]

---

(continued…)
Titeflex "attorney fees for services rendered *through the trial of this case*" (emphasis added)).

[93]     *Petroleum Sols., Inc. v. Head*, 454 S.W.3d 518, 577 (Tex. App.—Corpus Christi 2011), *aff'd in part, rev'd in part*, 454 S.W.3d 482 (Tex. 2014).  This issue was
(continued…)

The Section 82.002(a) obligation is for "indemnity" and does not reach fees, expenses and costs incurred by Titeflex, a component-product manufacturer, in defending against an unsuccessful Section 82.002 claim by PSI, the finished-product manufacturer.[94]   As stated in *Equitable Recovery, L.P. v. Heath Ins. Brokers of Tex., L.P.*, the general rule under Texas law is that "[t]here can be no contribution or indemnity between two parties based on a direct claim between them."[95]   The scope of Section 82.002 indemnification must be interpreted in light of this principle.   The statutory obligation does not extend to losses (such as fees and expenses) caused by litigation between manufacturers/sellers asserting competing Section 82.002 claims against each other.

---

(continued…)

not presented for review by the Texas Supreme Court.   Instead, the Texas Supreme Court's analysis was confined to the following issues concerning the Titeflex Judgment: (1) the nature of the duty to indemnify between finished-product manufacturers and component-product manufacturers; (2) whether improvement to real property may constitute a product; and (3) whether the Titeflex Judgment was affected by the trial court's erroneous spoliation instruction.

[94]   Section 82.002(a) provides:

> A manufacturer shall indemnify and hold harmless a seller against loss arising out of a products liability action, except for any loss caused by the seller's negligence, intentional misconduct, or other act or omission . . . for which the seller is independently liable.   (Emphasis added.)

[95]   235 S.W.3d 376, 387 (Tex. App.—Dallas 2007, pet. denied).   No party has cited authority that Section 82.002 should be interpreted as an exception to this rule. Indeed, PSI urged the Corpus Christi Texas Court of Appeals to reduce the Titeflex Judgment based on this rule.   *See* Brief for Appellant Petroleum Solutions, Inc., *Petrol. Sols., Inc. v. Head*, 454 S.W.3d 518 (Tex. App.—Corpus Christi 2011), 2010 WL 1768424, at *65–66.   The Corpus Christi Texas Court of Appeals did not reach the question because it concluded PSI had waived the objection in the trial court.   *See Petroleum Sols., Inc. v. Head*, 454 S.W.3d 518, 577 (Tex. App.—Corpus Christi 2011), *aff'd in part, rev'd in part*, 454 S.W.3d 482 (Tex. 2014).

25

PSI argues that the Texas Supreme Court in *Fresh Coat, Inc. v. K–2, Inc.* referred in passing to a Section 82.002(a) claim as "brought in a 'products liability action.'"[96]   PSI relies on this thin reed to maintain that a Section 82.002 claim creates an exception from the rule stated in *Equitable Recovery*,[97] and that, accordingly, losses attributable to defense against a Section 82.002 claim are losses "arising out of a products liability action" indemnifiable under Section 82.002(a).[98] The Court is unpersuaded that *Fresh Coat* overrules or modifies the holding in *Equitable Recovery* that "[t]here can be no indemnity between two parties based on a direct claim between them."[99]   Indeed, *Equitable Recovery* was not mentioned by the Texas Supreme Court in *Fresh Coat*.  The phrase in *Fresh Coat* on which PSI relies was in the context of an entirely different point and, at best, is *dicta*.[100]   And,

---

[96]      318 S.W.3d 893, 900 (Tex. 2010).

[97]      PSI only seeks to distinguish *Equitable Recovery* and does not dispute that it states a generally valid principle of Texas law.  *See* PSI Recon. Reply [Doc. # 101], at 8 ("PSI does not dispute the *general* rule as espoused by *Equitable Recovery*, but this case is about claims under Chapter 82 of the Texas Civil Practice and Remedies Code.").  PSI relies solely on the contention that Section 82.002 is a legal exception to the rule stated in *Equitable Recovery* and does not seek to distinguish that case on its facts.

[98]      *See* PSI Recon. Reply [Doc. # 101], 13–14.

[99]      235 S.W.3d at 387.

[100]      The question presented in *Fresh Coat* was whether a manufacturer's Section 82.002(a) obligation "covers a settlement payment made by [a seller] to [a plaintiff] where the [seller] may have been independently obligated by contract to indemnify" the plaintiff.  *See* 318 S.W.3d at 895.  The settlement payment in question related directly to compensation to the plaintiff for damage caused by the products liability wrongs.  The Texas Supreme Court rejected the manufacturer's argument that the exception in Section 82.002(a) for a seller's independent liability covered the settlement payments because that exception only applies where the seller is actually at fault.  *See id.*, at 901 ("[W]hat is important is not merely whether a seller is independently liable, but *why*.").   There was no discussion of indemnification of attorney's fees, expenses and costs.

26

the Texas Supreme Court was without the benefit of briefing by the parties or analysis on the question at bar.  The Court concludes that the fees, expenses and costs incurred by Titeflex in defending solely against PSI's Affirmative Claim were not recoverable under Section 82.002(a).[101]

*Section 82.002(g) Component of the Titeflex Judgment.*— The Titeflex Judgment did not distinguish between the indemnity required by Section 82.002(a) and the fees, expenses and costs awarded as part of the fee-shifting provision in Section 82.002(g) (component (3) of the Titeflex Judgment).[102]  Examination of the timeline of the State Court Litigation reveals that these amounts appear to be easily segregated for the purposes of this coverage dispute.

The Section 82.002(a) indemnification obligation includes a causation requirement.  Statutory indemnity under Section 82.002(a) applies only to "losses related to allegations that the [manufacturer's product] was defective."[103]  This indemnification obligation is often triggered by the injured person's allegations against the seller and generally terminates when those allegations are no longer asserted in an action.  For example, in *Seelin Medical, Inc. v. Invacare Corp.*, a Texas Court of Appeals held that a manufacturer's duty to indemnify the seller

---

[101]   Also, this conclusion does not address a possible estoppel based on PSI's counsel's waiver of the issue of allocation of fees at the trial in the State Court Litigation between those incurred defending against Head's claims and those defending against PSI's Affirmative Claim.  *See infra* notes 238 and 240-244, and accompanying text.

[102]   Section 82.002(g) provides:

> A seller is entitled to recover from the manufacturer court costs and other reasonable expenses, reasonable attorney fees, and any reasonable damages incurred by the seller to enforce the seller's right to indemnification under this section.

[103]   *Hudiburg*, 199 S.W.3d at 262.

began when the injured person sued both seller and manufacturer based on allegations that the manufacturer was at fault for the injury.[104]  The obligation to indemnify terminated when the injured person adopted a different theory of liability, alleging a different manufacturer was at fault, and abandoned its original allegations.  That abandonment, however, did not retroactively eliminate the duty to indemnify for losses incurred while those allegations were pending in the case.[105]  The Section 82.002(a) component of the Titeflex Judgment is therefore measured by losses incurred by Titeflex that were caused by Head's products liability claims.

On January 30, 2007, Head asserted products liability claims against Titeflex in his First Amended Original Petition.[106]  According to the Texas Supreme Court, these allegations triggered PSI's indemnification obligation.[107]  Head non-suited

---

[104]   *See Seelin Med., Inc. v. Invacare Corp.*, 203 S.W.3d 867, 871–72 (Tex. App.—Eastland 2006, *rev. denied*, Apr 27, 2007).

[105]   *Id.*, at 871.

[106]   In his amended pleading, Head alleged, "[a]s stated in [PSI's] third party action, Petroleum Solutions purchased the underground flex connector from Titeflex.  Titeflex manufactured the flex connector.  Titeflex is strictly liable for damages caused by the defective flex connector."  Exh. A24 to Mid-Continent Motion [Doc. # 68-28], at 3, ¶ 9.  The First Amended Original Petition further alleged that Head had performed "an emergency response cleanup" upon learning of the leak and that "the TRNCC [Texas Natural Resource Conservation Commission] ordered a full remediation which is being prepared by the plaintiff."  *Id.*, at 4, ¶ 11.  Head noted that "Health & Safety Code, Tex. H. & S. Code § 361.344 provides that a party may recover expenses of cleanup and remedial action performed pursuant to TNRCC mandated corrective action," so "[t]he responsible parties, Titeflex and Petroleum Solutions, Inc. are responsible for the cleanup costs."  *Id.*, at 4, ¶¶ 10–11.

[107]   *PSI v. Head*, 454 S.W.3d at 493 ("Based on Head's pleadings, [PSI] . . . owed Titeflex . . . a duty to indemnify it under section 82.002 for losses arising out of this products liability action, to the extent Titeflex was not independently liable for those losses." (footnote omitted)).

his claims against Titeflex on March 7, 2008.  There is no contention or record evidence that Titeflex defended against a products liability claim following that date.  Titeflex's continued participation in the State Court Litigation related only to the Section 82.002 claims, that is, as a plaintiff on its Counterclaim against PSI filed May 19, 2008, and, until August 12, 2008, as a defendant to PSI's Affirmative Claim.  Therefore, the amount of PSI's obligation under Section 82.002(a) comprises losses incurred by Titeflex while Head's claim against Titeflex was pending between January 30, 2007, and March 7, 2008.  The precise amount of these fees and expenses must be determined at trial.[108]

To recap, the parties asserted various claims in the different proceedings pertinent to the coverage action at bar.  These claims are: (1) Head's state law products liability claim against PSI; (2) Head's state law products liability claim against Titeflex; (3) PSI's Section 82.002 claim against Titeflex; (4) Titeflex's Section 82.002(a) claim against PSI; (5) Titeflex's claim against PSI for fee-shifting under Section 82.002(g); and (6) Mid-Continent's declaratory judgment claim and PSI's claims against Mid-Continent, both seeking rulings on coverage under the Policy.  It is critical to bear in mind the posture of the parties when undertaking analysis of each issue.

---

[108]   The Court attempted to determine this amount from the billing records submitted to the jury in the State Court Litigation.  *See* Exh. 57 to PSI Motion [Docs. # 88-1 to # 88-9].  The parties, however, disagree about what should be included and the issue will be resolved at trial.  Furthermore, this analysis is subject to the outcome at trial of the fact dispute about whether the waiver by PSI through the counsel selected by Mid-Continent of the issue of allocation of Titeflex's fees attributable to defense against Head's claims as opposed to defense against PSI's Affirmative Claim should work an estoppel in this coverage litigation.  *See infra* notes 238 and 240-244, and accompanying text.

## C.     The Duty to Cooperate

Mid-Continent seeks summary judgment that coverage does not exist under the Policy because PSI failed to cooperate in the conduct of the State Court Litigation when, on August 15, 2008, it rejected Titeflex's Settlement Offer of mutual dismissals with prejudice.  In response, PSI argues that accepting Titeflex's Settlement Offer of dismissal with prejudice of PSI's Affirmative Claim would have been a bad bargain for PSI, because PSI faced potential liability to Head for which Mid-Continent had reserved the right to deny coverage, and PSI hoped for a potential alternative avenue for relief.  PSI also argues that Mid-Continent seeks an unprecedented expansion of the duty to cooperate to include a litigation decision by an insured regarding an affirmative claim against a third party.[109]

The Court concludes that the duty to cooperate applies to PSI's rejection of the Settlement Offer, but that a genuine issue of material fact remains regarding whether PSI's conduct actually breached that duty.

***Definition of the Duty to Cooperate in the Policy.***— The duty to cooperate is created in the Policy in section IV(2), "Duties In The Event Of Occurrence, Offense, Claim Or Suit."[110]  That provision states in pertinent part:

c.     You and any other involved insured must:

* * * *

(3)     Cooperate with us in the investigation or settlement of the claim or defense against the 'suit'[.][111]

---

[109]    The Court rejects PSI's contentions that Mid-Continent is estopped from raising the duty to cooperate.  Mid-Continent's August 26, 2008 Letter informed PSI that the insurer reserved the right to disclaim coverage based on PSI's failure to cooperate.  *See* Exh. A40 to Mid-Continent Motion [Doc. # 68-44], at 7.  Mid-Continent's September 19, 2008 Letter to PSI clarified sufficiently that this statement applied to the Titeflex Counterclaim.  *See* Exh. A43 to Mid-Continent Motion [Doc. # 68-47], at 1.

[110]    *See infra* Appendix, at 94–97.

The Policy does not define the term "claim."  As used in Policy section IV(2), "claim" refers to a request for relief against the insured, here, PSI.[112]  The Policy has a definition for "suit":

> "Suit" means a civil proceeding in which damages because of "bodily injury", "property damage" or "personal and advertising injury" to which this insurance applies are alleged.[113]

Because "suit" is defined to include the entire "civil proceeding," the assertion of, or retention of a right to assert, a right of action by PSI in response to a claim against it is part of "defense against" a "suit" under the Policy.

The duty to cooperate set forth in Policy section IV(2)(c)(3) (the "cooperation clause") is a standard provision in insurance policies and is "intended to guarantee to insurers the right to prepare adequately their defense on questions of substantive liability."[114]  A violation of the cooperation clause will preclude coverage where the violation prejudices the insurer.[115]  Examples of prejudice to the insurer include deprivation of a valid defense or opportunity to engage in settlement discussions.[116]

As the party asserting a claim for breach of contract, PSI bears the burden of establishing that it performed under the Policy, including fulfilling its obligations

---

[111]  (continued…)
Policy [Doc. # 63-2], at CGL Form page 9 (ECF page 22), § IV(2)(c)(3).

[112]  *See id.*, § IV(2).

[113]  *Id.*, at CGL Form page 13 (ECF page 27), § V(18)

[114]  *Quorom Health Res., L.L.C. v. Maverick Cnty. Hosp. Dist.*, 308 F.3d 451, 468 (5th Cir. 2002) (quotation omitted).

[115]  *Id.*, at 468 ("To breach its duty to cooperate, an insured's conduct must materially prejudice the insurer's ability to defend the lawsuit on the insured's behalf.").

[116]  *U.S. Cas. Co. v. Schlein*, 338 F.2d 169, 173 (5th Cir. 1964).

under the cooperation clause.   Mid-Continent, however, bears the burden of showing that it was prejudiced by any failure to cooperate.[117]

*The "Duty to Cooperate" Encompasses Settlement of PSI's Affirmative Claim.*— There is no dispute that Mid-Continent sought to settle Titeflex's claim against PSI through the Settlement Offer.   PSI challenges whether Mid-Continent could require PSI's cooperation because the Settlement Offer's terms prejudiced PSI's Affirmative Claim.

The Policy contains no textual limitation on the terms or scope of settlement that are governed by the Policy's cooperation clause.[118]   A settlement is a compromise that is often based on exchange of items of value.   Here, the items of value were PSI and Titeflex's respective causes of action under Section 82.002.

PSI argues that the cooperation clause's phrase "settlement of *the* claim" encompasses purely defensive actions related to Titeflex's specific claim against PSI, but does not extend to what PSI characterizes as its offensive strategy, here, PSI's Affirmative Claim under Section 82.002.   PSI's contention is off the mark.   The cooperation clause authorizes Mid-Continent to request cooperation in "settlement of the claim . . . or defense against the 'suit'."   The entire clause must

---

[117]   *Schlein*, 338 F.2d at 174 ("Texas imposes on the insurer claiming a breach [of the cooperation clause] the burden of establishing that the [failure to cooperate] prejudiced the insurer.").   Mid-Continent cites an intermediate Texas appellate decision, *Progressive Cty Mut. Ins. Co. v. Trevino*, 202 S.W.3d 811 (Tex. App.—San Antonio 2006, pet. denied) (citing *Harwell v. State Farm Mut. Auto. Ins. Co.*, 896 S.W.2d 170 (Tex. 1995)), for the proposition that the cooperation clause creates a condition precedent to coverage.   The key attribute of a condition precedent is that even a minor failure to fulfill such a condition defeats a claim for breach of contract.   *See, e.g.*, *Members Mut. Ins. Co. v. Cutaia*, 476 S.W.2d 278 (Tex. 1972).   The requirement that the insurer show actual prejudice therefore makes a decision on the condition precedent issue academic.

[118]   The legal term "settlement" has a broad meaning: "[a]n agreement ending a dispute or lawsuit." *Settlement*, BLACK'S LAW DICTIONARY (10th ed. 2014).

32

be read in light of the broad definition of "suit," which includes the entire "civil proceeding." PSI's Affirmative Claim was integral to PSI's defensive strategy in the State Court Litigation. Therefore, PSI's attempt now to exclude that claim from the range of potential aspects of settlement that are within the cooperation clause is rejected.[119]   Dismissal of the Affirmative Claim with prejudice was among the items of value that could be offered to Titeflex as part of a "settlement of the claim."[120]

---

[119]   PSI argues that this interpretation of "claim or 'suit'" grants Mid-Continent excessive settlement authority under the Policy. The same phrase appears in Policy section I(A)(1)(a), which provides, in pertinent part, "[w]e [Mid-Continent] may, at our discretion, investigate any 'occurrence' and settle any claim or 'suit' that may result." *See* Policy [Doc. # 63-2], at CGL Form page 1 (ECF page 14), § I(A)(1)(a). PSI contends that application of the Court's interpretation of the phrase "claim or 'suit'" in the cooperation clause to include the entire civil proceeding would grant Mid-Continent "unfettered right to dismiss PSI's affirmative claim." This argument is rejected for two reasons.

First, the Policy defines "suit" as a "civil proceeding." *See* Policy [Doc. # 63-2], at CGL Form page 13 (ECF page 27), § V(18). The plain meaning of "civil proceeding" is broader than solely claims against the insured party. Second, PSI's interpretation of Policy section I(A)(1)(a) is overbroad. The right of the insurer to settle under section I(A)(1)(a) is modified by the other provisions of the Policy, including the reasonableness inquiry under the cooperation clause. *See infra* notes 123-127 and accompanying text. Indeed, PSI's broad reading of section I(A)(1)(a) that the settlement authority in Policy section I(A)(1)(a) provided the insurer "unfettered discretion" over the entire civil proceeding would make the cooperation clause in Policy section IV superfluous.

[120]   PSI argues that Mid-Continent attempts to transform the Policy's cooperation clause into a "hammer clause." PSI Recon. Reply [Doc. # 101], at 16 & n.41. A hammer clause is a negotiated feature of an insurance policy. The Policy in this case does not contain such a clause. A hammer clause provides the insurer with additional rights to limit its exposure under the policy. *See* Jonathan L. Schwartz, Esq., & Seth L. Laver, Esq., *The Case of the Missing Insured: A Tricky Variation on the Consent to Settle*, 10 No. 21 WESTLAW J. INS. BAD FAITH 2, at *2 (Feb. 18, 2015) ("A typical hammer provision states as follows: 'The company [the insurer] shall . . . not settle any claim without the written consent of the named insured, which consent shall not be unreasonably withheld. If, however, the named insured

(continued…)

33

***Whether PSI's Rejection of the Settlement Offer Did or Did Not Violate the Cooperation Clause as a Matter of Law.***— "Determination of what constitutes a breach of the cooperation clause of a liability policy is usually a question of fact."[121]   The cooperation clause is violated where the insured's conduct is not "reasonable and justified under the circumstances."[122]  Neither party has carried its

---

(continued…)

refuses to consent to a settlement recommended by the company and elects to contest the claim or continue legal proceedings in connection with such claim, the company's liability for the claim shall not exceed the amount for which the claim could have been settled, including claims expenses up to the date of such refusal, or the applicable limits of liability, whichever is less.'"); *see also Sec. Ins. Co. of Hartford v. Schipporeit, Inc.*, 69 F.3d 1377, 1383 (7th Cir. 1995) ("This settlement language in the policy speaks to a relatively narrow situation.  If an insured is presented with an opportunity to dispose of a claim and the insurer recommends that the claim be resolved, the insured may refuse to accept the insurer's recommendation only at his peril.  The risk of loss over and above the proposed settlement passes to the insured."); *Scottsdale Ins. Co. v. Ala. Mun. Ins. Corp.*, No. 2:11-cv-668-MEF, 2013 WL 5231928, at *13 (M.D. Ala. Sept. 16, 2013) (discussing consequences of enforcement of the hammer clause's terms).  Unlike the limitation of coverage under a hammer clause, a material breach of the cooperation clause, as Mid-Continent claims occurred here, voids coverage entirely.  The hammer clause is therefore irrelevant to the analysis of PSI's obligations under the Policy's cooperation clause.

[121]  *Frazier v. Glens Falls Indem. Co.*, 278 S.W.2d 388, 391 (Tex. Civ. App.—Fort Worth 1955, writ ref'd n.r.e.).  Neither party cites Texas law regarding the applicable standard for resolving the factual question of whether an insured's actions violate the cooperation clause.

[122]  *Id.*, at 392; *see also* 14 COUCH ON INSURANCE § 199:50 (3d ed. 2015) ("An insured cannot *arbitrarily or unreasonably* decline to assist in making a fair and legitimate defense to be made in his or her name." (emphasis added)); 4-32 NEW APPLEMAN LAW OF LIABILITY INSURANCE § 32.04 (2016) ("Where the cooperation provision is limited to general terms, the scope of the policyholder's duties will depend on what is reasonable given the totality of the circumstances.").  In *Frazier*, the alleged violation of the cooperation clause was the insured's refusal to sign a statement prepared by the insurer.  278 S.W.2d at 392.  The insurer in *Frazier* also argued that the insured had violated the cooperation clause by colluding with the victim plaintiff.  The *Frazier* court held that collusion between

(continued…)

34

burden to show the absence of a genuine issue of material fact regarding the reasonableness of PSI's rejection of the settlement offer.

The record includes many facts that must be weighed to determine the reasonableness of PSI's rejection of the Settlement Offer.  PSI's independent counsel explained in a letter on August 18, 2008, that PSI saw several reasons not to accept the Settlement Offer.[123]  PSI had received advice from Hogan earlier in the State Court Litigation that PSI had a strong claim under Section 82.002 while Hogan saw weaknesses in Titeflex's Counterclaim.[124]  Counsel had advised that the Titeflex Counterclaim was a mere reformulation of PSI's Affirmative Claim, so PSI may have believed dismissal without prejudice of its Affirmative Claim resulted in automatic dismissal of the Titeflex Counterclaim.[125]  PSI took the position that it was only a "seller" and Titeflex only a "manufacturer," so it believed that *allegations* in Head's pleadings were sufficient to support a Section

---

(continued…)
plaintiff and insured constitutes a violation of the cooperation clause where the insured acted fraudulently.  Mid-Continent does not argue that PSI colluded with Titeflex, so this portion of *Frazier* is inapposite.

[123]   Exh. 29 to PSI Motion, Letter from Michael A. McGurk to Robert Bryant, dated Aug. 18, 2008 [Doc. # 63-31].

[124]   Hogan advised on June 2, 2008,

> I do not think that Titeflex has much of a claim to have been sued as an innocent seller.  The plaintiff also now has no claim against Titeflex, so any claim they could assert for indemnity (and I don't know what that claim might be) would be limited to what Titeflex might have expended defending the plaintiff's claims while those claims existed.  Titeflex has no claim against us to recover from us because we sued it.

Exh. 18 to PSI Motion, Email from Hogan to Michael A. McGurk, Vicinaiz, and Robert Bryant, dated June 2, 2008 [Doc. # 63-20].

[125]   Exh. 27 to PSI Motion, Letter from Vicinaiz to Robert Bryant, dated Aug. 12, 2008 [Doc. # 63-29], at 1–2.

82.002 claim against Titeflex even though the loss of the flex connector would make proving liability on the merits difficult.[126]  Most importantly, PSI viewed the deal as a bad bargain because Mid-Continent had reserved the right to disclaim coverage of potential liability to Head.[127]  Finally, PSI had a mere 48 hours to evaluate the Settlement Offer.

Mid-Continent's position also finds some support in the record.  Titeflex had represented that it would seek recovery in excess of $350,000[128] and counsel had advised that the trial court judge would permit the Titeflex Counterclaim to proceed.[129]  Even if PSI had some possibility of success, acceptance of the Settlement Offer would have resolved significant short-term exposure with certainty.  Further, while the allegations about the flex connector may have triggered a duty on Titeflex's part, *Hudiburg* had already established principles of law that suggest allegations are not sufficient where there are competing Section 82.002 claims between a component-part manufacturer and a finished-product manufacturer.[130]  PSI's position on the merits had been significantly weakened by

---

[126]   *See* Exh. 21 to PSI Motion, Letter from Vicinaiz to Thomas A. Cowen, dated Mar. 19, 2008 [Doc. # 63-23], at 3 ("Titeflex's duty to indemnify PSI exists because the plaintiff, Head, has *ab initio*, and to this date, alleged that Titeflex's flex connector was defective.  PSI does not have to possess the flex connector or be able to produce the flex connector to Titeflex in order to obtain indemnity.").

[127]   *See, e.g.*, Exh. 28 to PSI Motion, Email from Vicinaiz to Robert Glover, dated Aug. 14, 2008 [Doc. # 63-30], at ECF page 1 (noting that PSI was opposed to the Settlement Offer due to Mid-Continent's reservation of rights).

[128]   Exh. 26 to PSI Motion, Letter from Thomas A. Cowen to Vicinaiz, dated Aug. 13, 2008 [Doc. # 63-28].

[129]   Exh. 27 to PSI Motion, Letter from Vicinaiz to Robert Bryant, dated Aug. 12, 2008 [Doc. # 63-29], at 2.

[130]   *See supra* notes 79–83 and accompanying text.  PSI's independent counsel acknowledged that the Titeflex Counterclaim was modeled on *Hudiburg*.  *See*
(continued…)

the loss of the flex connector and its expert witness.[131]  These considerations, along with other relevant facts, must be weighed by a trier of fact.  The Court cannot decide as a matter of law whether PSI's conduct was reasonable.[132]

Neither party provides authority that establishes that the cooperation clause was or was not violated as a matter of law.  PSI cites *Progressive County Mutual Insurance Co. v. Trevino*[133] and *State Farm Lloyds v. Brown*.[134]  These cases involved egregious examples of uncooperative behavior.[135]  Mid-Continent

---

(continued…)
Exh. 29 to PSI Motion, Letter from Michael A. McGurk to Robert Bryant, dated Aug. 18, 2008 [Doc. # 63-31], at 2.

[131]  Exh. 27 to PSI Motion, Letter from Vicinaiz to Robert Bryant, dated Aug. 12, 2008 [Doc. # 63-29], at 2.

[132]  PSI describes a parade of horribles that may ensue from application of the duty to cooperate under these circumstances.  PSI's arguments regarding the "negative consequences" of applying the duty to cooperate in this context, *see* PSI Recon. Motion [Doc. # 94], at 12–15, relate to evaluation of the reasonableness of PSI's actions, and not general principles of law.  The reasonableness inquiry in this case includes consideration of the effect of the Settlement Offer on PSI's interests, which inquiry offers PSI sufficient protection.  The Court finds unpersuasive PSI's assertion that application of the duty to cooperate would leave it "without protection from settlement offers that adversely affect its interest."

PSI claims that an insurer's duties to the insured are limited to the duty to defend and duty to indemnify, neither of which, according to PSI, protects PSI from Mid-Continent's insistence on settlement of the Affirmative Claim.  *See* PSI Recon. Reply [Doc. # 101], at 18.  PSI overlooks the interaction of the cooperation clause with the duty to indemnify.  The insurer will not be relieved of its obligation under the duty to indemnify unless it can show that the insured unreasonably withheld cooperation in settlement of a claim and that that lack of cooperation prejudiced the insurer.  Under the Court's interpretation, a reasonable disagreement or technical violation will not operate to void coverage.

[133]  202 S.W.3d 811.

[134]  Civ. A. No. 3:08-cv-318-O, 2009 WL 2902511 (N.D. Tex. Sept. 9, 2009).

[135]  *Trevino*, 202 S.W.3d at 817 ("Given [the insured's] lack of cooperation with his defense, his filing of a pro se answer and frivolous counterclaim despite having
(continued…)

37

concedes that PSI's actions do not resemble the facts of those cases.[136]   However, nothing in these cases sets a standard for a finding of failure to cooperate as a matter of law.[137]   Similarly, Mid-Continent's reliance on *Laster v. American National Fire Insurance Co.*[138] is misplaced.   Like the insureds in *Trevino* and *Brown*, the insured in *Laster* failed to participate in litigation to an egregious extent, which conduct invited a substantial adverse judgment.[139]

---

(continued...)
counsel hired by [the insurer] to represent him, his adamancy about [the insurer] not paying on the claim, and his guardian's telephone message indicating that [the insured] did not intend 'to be involved in this at all', the attorney hired by [the insurer] was simply not permitted to appear on [the insured]'s behalf in court."); *Brown*, 2009 WL 2902511, at *1, *3 (holding that insurer was prejudiced by failure to cooperate where insured missed appointments with counsel, failed to assist with responses to discovery requests, and did not appear for trial, resulting in a verdict based on the opponent's evidence alone).

[136]   *See* Mid-Continent Motion [Doc. # 68-1], at 26.

[137]   PSI also relies on a case in which a court found that the duty to cooperate did not require the insured to waive its attorney-client privilege.   *Fugro-McClelland Marine Geosciences, Inc. v. Steadfast Ins. Co.*, Civ. A. No. H-07-1731, 2008 WL 5273304, at *4 (S.D. Tex. Dec. 19, 2008) (Smith, M.J.).   It is not apparent how this ruling controls the analysis of an insured's decision to reject a settlement offer.

[138]   775 F. Supp. 985 (N.D. Tex. 1991) (McBryde, J.).

[139]   *Id.*, at 999 ("A more glaring case of lack of cooperation by an insured . . . would be difficult to find.").   Among other deleterious actions in the litigation, the insured failed to respond to the plaintiff's request for admissions, so facts giving rise to liability were deemed to have been proven.   *See* 775 F. Supp. at 985.

Mid-Continent relies on the statement in *Laster* that "[i]mplicit in an excess insurance contract of this kind is an obligation on the part of the insured to take reasonable steps to avoid legal liability or to minimize the amount of his legal liability," 775 F. Supp. at 995, to argue that PSI should have accepted the settlement offer to minimize its amount of legal liability.   This discussion in *Laster*, however, relates to an "*excess* insurer's rights," *see id.* (emphasis added), and is separate from the duty of an insured to cooperate with its primary insurer.

Mid-Continent's cited authorities involving jurisdictions other than Texas are also inapposite.[140]   These cases concern bad faith claims against insurers for liability on excess judgments.[141]   In each instance, the insured rejected a settlement offer, an excess judgment ensued, and the judgment creditor later stepped into the insured's shoes.[142]   The judgment creditor sued the insurer for the amount of the excess judgment asserting that the insurer had acted in bad faith when the insured rejected the settlement offer.[143]   Each court held that the insurer was not liable to the judgment creditor because the insurer had fulfilled its duty to advise the insured regarding the risks of rejecting the settlement offer.[144]

These cases are not probative on the question of whether PSI breached the cooperation clause.   None of these cases addressed the contractual duty to cooperate in the applicable insurance policies. Under the applicable law in the

---

[140]   *See Maldonado v. First Liberty Ins. Corp.*, 342 F. App'x 485 (11th Cir. 2009) (Florida law); *Carlile v. Farmers Ins. Exch.*, 219 Cal. Rptr. 773 (Cal. Ct. App. 1985); *Bos. Old Colony Ins. Co. v. Gutierrez*, 386 So.2d 783 (Fla. 1980).

[141]   In a typical bad faith action predicated on the duty to accept a reasonable settlement offer, the allegation is that the insurer rejected a reasonable settlement offer and should be liable for the portion of the ensuing judgment that is in excess of the policy limit.   Under Texas law, an insurer's duty to accept a reasonable settlement offer, which was first articulated in *G.A. Stowers Furniture Co. v. Am. Indem. Co.*, 15 S.W.2d 544 (Tex. Comm'n App. 1929, holding approved), "shifts the risk of an excess judgment from the insured to the insurer by subjecting an insurer to liability for the wrongful refusal to settle a claim against the insured within policy limits."   *AFTCO Enters., Inc. v. Acceptance Indem. Ins. Co.*, 321 S.W.3d 65, 69 (Tex. App.—Houston [1st Dist.] 2010, pet. denied).

[142]   *Maldonado*, 342 F. App'x at 486; *Carlile*, 219 Cal. Rptr. at 774–75; *Gutierrez*, 386 So. 2d at 784.

[143]   *Maldonado*, 342 F. App'x at 486–87; *Carlile*, 219 Cal. Rptr. at 776; *Gutierrez*, 386 So. 2d at 784–85.

[144]   *Maldonado*, 342 F. App'x at 487–88; *Carlile*, 219 Cal. Rptr. at 776; *Gutierrez*, 386 So. 2d at 785.

respective jurisdictions, the insurer had a duty of good faith and fair dealing to advise its insured about the risks of rejecting a viable settlement. The focus there was on the *insurer's* actions and whether the insurer's conduct justifies *extra-contractual* recovery for bad faith or on any other theory warranting a recovery in excess of the policy limits.[145]

*Prejudice.—* Under Texas law, entry of an adverse judgment against an insured constitutes prejudice to the insurer if that judgment would not have been entered if the insured had cooperated.[146] If PSI is found to have breached the cooperation clause by rejecting the Settlement Offer, a finding the Court has not made, Mid-Continent was prejudiced as a matter of law by the entry of the Titeflex Judgment.

PSI argues that the Titeflex Judgment itself is not evidence of prejudice because "[t]he mere fact that the insurer owes money that it does not wish to pay

---

[145]    *See, e.g., Maldonado*, 342 F. App'x at 487 ("[T]he focus in a bad faith case is not on the actions of the claimant but rather on those of the insurer in fulfilling its obligations to the insured." (quoting *Berges v. Infinity Ins. Co.*, 896 So. 2d 665, 677 (Fla. 2005))).

[146]    *See Rodriquez v. Tex. Farmers Ins. Co.*, 903 S.W.2d 499, 509 (Tex. App.—Amarillo 1995, no writ) ("It is undisputed that because of their agreement with the Ortegas, the Rodriquezes failed to cooperate with Farmers in its efforts to set aside the default judgment. Their failure to cooperate, in violation of their obligation under the insurance policy, resulted in prejudice to Farmers in the amount of 1.65 million dollars [the amount of the default judgment], which was more than 16 times the coverage under Farmer's policy. Thus, Farmers was prejudiced as a matter of law . . . ."); *see also Liberty Mut. Ins. Co. v. Cruz*, 883 S.W.2d 164, 166 (Tex. 1993) (*per curiam*) (holding that insurer was prejudiced in the amount of the judgment as a matter of law by failure to send any notice of the suit and subsequent entry of a default judgment); *see generally* 14 COUCH ON INSURANCE § 199:79 (3d ed. 2016) (noting that entry of an adverse judgment against the insured may constitute prejudice under the duty to cooperate).

does not constitute prejudice as a matter of law."[147]   PSI relies on the case *Insurance Co. of North America v. McCarthy Brothers Co.*,[148] but reads it too broadly.   *McCarthy Brothers* addressed whether an insurer could assert the "consent to settle" clause to disclaim coverage of a settlement entered into by the insured without the insurer's consent.   The court restated the rule that a mere technical violation of a provision does not permit an insurer to disclaim coverage. Thus, regarding the "consent to settle" clause, an insurer is not prejudiced by an insured's voluntary assumption of liability where the insurer would nevertheless have consented to the settlement.[149]

If the facts at bar, namely, PSI's refusal to accept Titeflex's offer of mutual dismissals with prejudice, support a finding that PSI acted unreasonably, PSI's rejection of the settlement offer would not be a mere technical violation of the cooperation clause.   Acceptance of the Settlement Offer would have resulted in complete avoidance of PSI's liability to Titeflex and, therefore, no claim for coverage for Titeflex's claim.[150]   Instead, a substantial judgment was entered

---

[147]   PSI Recon. Motion [Doc. # 94], at 16 (quoting *Ins. Co. of N. Am. v. McCarthy Bros. Co.*, 123 F. Supp. 373, 379 (S.D. Tex. 2000) (Kent, J.)).

[148]   123 F. Supp. 373, 379 (S.D. Tex. 2000) (Kent, J.).

[149]   *See id.* (citing *Hernandez v. Gulf Grp. Lloyds*, 875 S.W.2d 691, 693–94 (Tex. 1994)).

[150]   PSI also cites *St. Paul Guardian Ins. Co. v. Centrum G.S. Ltd.*, 383 F. Supp. 2d 891 (N.D. Tex. 2003) (Lindsay, J.), in which the district court held that "an insurer's inability or failure to obtain a smaller settlement, or more favorable settlement, [does not] constitute[] prejudice sufficient to relieve an insurer of its duty to defend or indemnify its insured."  *Id.*, at 902.   *Centrum* involved late notice to the insurer.   The notice was given two years after the filing of the liability lawsuit, but more than two years before that case went to trial.   It does not appear that the late notice was alleged to have caused the entry of an adverse judgment.

against PSI, for which PSI seeks indemnity.  PSI therefore deprived Mid-Continent of the opportunity to avoid liability entirely.[151]

*Waiver.*— PSI argues that Mid-Continent waived the right to rely on the cooperation clause to deny coverage.[152]  "Waiver is the intentional relinquishment of a right actually known, or intentional conduct inconsistent with claiming that right."[153]  The elements of waiver are "(1) an existing right, benefit, or advantage held by a party; (2) the party's actual knowledge of its existence; and (3) the party's actual intent to relinquish the right, or intentional conduct inconsistent with the right."[154]  Waiver may be resolved as an issue of law where surrounding facts and circumstances are undisputed.[155]

PSI argues that Mid-Continent cannot invoke the cooperation clause because Mid-Continent remained silent regarding the cooperation clause until after the Texas Supreme Court's decision in 2014 affirming the Titeflex Judgment.[156] Under Texas law, "[s]ilence or inaction, for so long a period as to show an intention to yield the known right, is . . . enough to prove waiver."[157]  Mid-Continent indicated its intent to rely on the cooperation clause in letters sent to PSI

---

[151]  *See Rodriquez*, 903 S.W.2d at 509 (holding that an insurer was prejudiced by insured's lack of cooperation where insured's actions prevented insurer from vacating an infirm default judgment).

[152]  PSI Recon. Motion [Doc. # 94], at 17–19.

[153]  *Ulico Cas. Co. v. Allied Pilots Ass'n*, 262 S.W.3d 773, 778 (Tex. 2008).

[154]  *Id.*

[155]  *See Addicks Servs., Inc. v. GGP-Bridgeland, LP*, 596 F.3d 286, 299 (5th Cir. 2010).

[156]  *See* PSI Recon. Motion [Doc. # 94], at 18–19.

[157]  *Tenneco Inc. v. Enter. Prods. Co.*, 925 S.W.2d 640, 643 (Tex. 1996).

in August and September of 2008.[158]  PSI has cited no authority requiring a more particularized notice.[159]

PSI argues that Mid-Continent acted inconsistently with an intention to assert the duty to cooperate regarding Titeflex's requirement of PSI's dismissal of its claim with prejudice.[160]  PSI points to Mid-Continent's defense of PSI through the appeal to the Texas Supreme Court.  This argument fails.  That defense was pursuant to a reservation of rights, which reservation included the duty to cooperate.[161]

---

[158]   *See supra* note 109 (discussing Exh. A40 to Mid-Continent Motion, Letter from Rod Evans to Mark Barron, dated Aug. 26, 2008 [Doc. # 68-44]; Exh. A43 to Mid-Continent Motion, Letter from Rod Evans to Mark Barron, dated Sept. 19, 2008 [Doc. # 68-47]).

[159]   While Mid-Continent's reference to the cooperation clause was vague, the record reveals various communications between PSI and Mid-Continent about the parties' disagreement whether PSI should accept Titeflex's offer to dismiss the parties' respective indemnity claims with prejudice.  Mid-Continent clearly and repeatedly stated its view to PSI's representatives that PSI should accept the Settlement Offer.  *See* Exh. A37 to Mid-Continent Motion, Letter from Vicinaiz to Robert Bryant, dated Aug. 12, 2008 [Doc. # 68-41]; Exh. A38 to Mid-Continent Motion, Emails between Robert Glover and Vicinaiz, dated Aug. 14, 2008 [Doc. # 68-42].  Mid-Continent's references to the cooperation clause do not constitute "intentional conduct inconsistent" with its right to rely on that clause.

PSI's argument that it was deprived of the ability to make an informed decision is irrelevant to the waiver analysis.  Instead, this argument would relate to the reliance element of an estoppel claim, which argument is rejected above.  *See generally supra* note 109.  To the extent PSI argues that Mid-Continent should have been clearer in its reservation of rights letters in August and September 2008, that argument is addressed by PSI's claim under Texas Insurance Code § 541.060(a)(4).  The Court grants summary judgment to Mid-Continent on the Insurance Code claim.  *See infra* Section IV.E.

[160]   *See* PSI Recon. Motion [Doc. # 94], at 19.

[161]   *See supra* note 110.  PSI also notes that Mid-Continent did not reference the duty to cooperate in its initial pleadings in this case.  *See* Complaint [Doc. # 1]; First Amended Complaint [Doc. # 2].  PSI cites no authority, however, that a party
(continued…)

Finally, PSI relies on Mid-Continent's refusal to waive the "no voluntary assumption of liability" condition when, while the Titeflex Judgment was on rehearing at the Texas Supreme Court in 2014, PSI and Titeflex considered negotiating a settlement.[162]   By this time, Mid-Continent had denied coverage for the Titeflex Judgment based expressly on the duty to cooperate.   The Court sees no discernible connection between Mid-Continent's positions on the two provisions.

***Conclusion on the Duty to Cooperate.***— There is a fact issue whether PSI's conduct declining to settle its Affirmative Claim against Titeflex with prejudice in exchange for Titeflex's dismissal of its claim against PSI violated PSI's contractual duty to cooperate in the settlement of claims or defenses.   Summary judgment is therefore **denied** on both parties' motions on this issue.   Because of the extensive briefing and intricacy of the other coverage issues, which, with minor exceptions, can be determined as a matter of law, judicial economy dictates that the Court resolve the remaining questions prior to trial on the cooperation clause.

## D.    Coverage for the Titeflex Judgment Under the Policy

In the State Court Litigation, Titeflex sought recovery from PSI of attorney's fees, expenses and court costs only.   Because an injured plaintiff's allegations

_____

(continued...)

waives an argument merely by first pleading it in a properly filed amended complaint.   The Court recognizes that the Second Amended Complaint [Doc. # 50], in which Mid-Continent first pleaded the duty to cooperate, was not filed until six years after the First Amended Complaint.   That delay, however, is attributable to the duration of the appellate proceedings in the State Court Litigation.   This coverage dispute was stayed and administratively closed on December 11, 2009, less than a year after Mid-Continent commenced it.   *See* Minute Entry Order [Doc. # 33].   During that period, no substantive litigation occurred.   The Second Amended Complaint was filed approximately one month after this case was reopened in 2015.   *See* Order Reopening Case [Doc. # 40].

[162]    *See* PSI Recon. Motion [Doc. # 94], at 19.

against an innocent seller trigger the manufacturer's duty to indemnify, a manufacturer may be responsible for the cost of the seller's defense regardless of the manufacturer's ultimate liability.[163]  Section 82.002(a) thus places the innocent seller's defense costs on the manufacturer.  This case presents the question of whether the seller's defense costs may be shifted to the manufacturer's CGL carrier.[164]

PSI bears the burden of demonstrating coverage under the Policy while Mid-Continent bears the burden of establishing the applicability of any exclusions to coverage.[165]

---

[163]  *See Honeywell v. GADA Builders, Inc.*, 2012 OK CIV APP 11, ¶ 26, 271 P.3d 88, 97 (Okla. Civ. App. 2012) ("A manufacturer's statutory duty to indemnify a seller for attorney fees and costs is analogous with an insurer's duty to defend the insured.  The insurer and the manufacturer are obligated to finance the insured and seller's defense, respectively.  The insurer defends on behalf of the insured and the manufacturer indemnifies the seller for its defense costs."); *see also Seelin*, 203 S.W.3d at 870 (analogizing manufacturer's duty to indemnify seller based on *allegations* against seller to "the eight-corners rule used to determine an insurer's duty to defend"); *see generally supra* notes 72–75 and accompanying text.

[164]  Under Texas law, the innocent seller's insurer may assert the seller's Section 82.002 cause of action to recover its legal fees.  *See Graco, Inc. v. CRC, Inc. of Tex.*, 47 S.W.3d 742 (Tex. App.—Dallas 2001, pet. denied) (rejecting the argument that the insurer does not qualify for Section 82.002 recovery of legal fees because an insurer is not a "seller" as defined in Section 82.001(3)).

[165]  *Guar. Nat'l Ins. Co. v. Vic Mfg. Co.*, 143 F.3d 192, 193 (5th Cir. 1998) ("The insured bears the initial burden of showing that there is coverage, while the insurer bears the burden of proving the applicability of any exclusions in the policy.").  PSI contends that Mid-Continent admitted that certain requirements for coverage had been met.  *See* PSI Reply [Doc. # 72], at 12–13.  Mid-Continent responds that PSI admitted the Policy does not cover the Titeflex Judgment.  *See* Mid-Continent Reply [Doc. # 74], at 6.  Neither purported admission bears the weight the respective party places on it.  The Court therefore reaches the merits of the coverage dispute.

The scope of CGL coverage for bodily injury and property damage is established by the Policy's "Insuring Agreement" at section I(A)(1)(a):

> We [Mid-Continent] will pay those sums that the insured [PSI] becomes legally obligated to pay as damages because of 'bodily injury' or 'property damage' to which this insurance applies.[166]

For PSI to carry its burden on the coverage issue on summary judgment, PSI must show that there is no genuine issue of material fact that (1) there was "'property damage' to which this insurance applies"[167] and (2) the Titeflex Judgment was awarded as "damages because of" that property damage.  PSI also argues for coverage because there are money damages to which the Professional Liability Endorsement may apply, an argument the Court addresses in Section III.D.3, *infra*. Mid-Continent invokes one exclusion in this case, Exclusion q, which is addressed in Section IV.D.4, *infra*.

### 1.   Policy Section I(A)(1)(b): "'Property Damage' To Which This Insurance Applies"

Section I(A)(1)(b) of the Insuring Agreement defines the scope of the phrase "'property damage' . . . to which [the Policy] applies."   Section I(A)(1)(b) provides:

> b.   This insurance applies to . . . "property damage" only if:
>
> (1)   The . . . "property damage" is caused by an "occurrence" that takes place in the "coverage territory"; and
>
> (2)   The . . . "property damage" occurs during the policy period; and

---

[166]   Policy [Doc. # 63-2], at CGL Form page 1 (ECF page 14), § I(A)(1)(a).  *See infra* Appendix, at 94.

[167]   No party argues the dispute involves bodily injury.

> (3)   Prior to the policy period, no insured . . . knew that the
> . . . "property damage" had occurred, in whole or in
> part. . . .[168]

The Court first determines whether there is a genuine issue of material fact regarding the existence of "property damage" as defined by the Policy. There is no dispute the injury to Head's real property is "property damage" within the Policy's definition. The Court therefore focuses in more detail on whether that property damage is causally connected to an "occurrence," as defined by the original Policy language. The Court then examines the timing of the property damage. The Court concludes that there was "'property damage' . . . to which [the Policy] applies." In the alternative, the Court determines that the Policy "applies" to the damage to Head's property pursuant to the Professional Liability Endorsement's definition of "occurrence."[169]

### a.   Property Damage

***Whether There Was "Property Damage."***— The Policy defines "property damage" as:

> a.   Physical injury to tangible property, including all resulting loss
> of use of that property. All such loss of use shall be deemed to
> occur at the time of the physical injury that caused it; or
>
> b.   Loss of use of tangible property that is not physically injured.
> All such loss of use shall be deemed to occur at the time of the
> "occurrence" that caused it.[170]

Neither party disputes that the fuel leak occurred on Head's property. While the question of liability was not resolved in the State Court Litigation,[171] it is

---

[168]   Policy [Doc. # 63-2], at CGL Form page 1 (ECF page 14), § I(A)(1)(b), as amended by Amendment of Insuring Agreement – Known Injury or Damage page 1 (ECF page 28), § I(A)(1)(b)(3).

[169]   *See infra* Section IV.D.1.e.

[170]   Policy [Doc. # 63-2], at CGL Form page 13 (ECF page 26), § V(17).

undisputed in the Motions that the fuel leak caused damage to Head's land.  As the Texas Supreme Court noted in the appeal of the judgment against PSI, "[t]he Texas Natural Resource Conservation Commission (now the Texas Commission on Environmental Quality) recorded a recovery of approximately 20,000 gallons of diesel fuel from the surrounding ground."[172]   The damage resulting from the oil spill constitutes a "physical injury" to Head's "tangible property" at Silver Spur.[173] Therefore, it cannot reasonably be disputed that there was damage to Head's property that satisfies the definition of "property damage" in the Policy.

*Effect of the Absence of a Finding of Liability to Head in the State Court Litigation on "'Property Damage' to Which This Insurance Applies."*— Mid-Continent argues that there is no "property damage to which this insurance applies" because there has been no final judgment in the State Court Litigation and thus PSI has not been found legally responsible for the damage to Head's property.[174]   Subsequent to completion of the briefing on the pending Motions,

---

(continued…)

[171]   The basis for summary judgment in favor of PSI did not relate to the merits of Head's claims.  *See* Exh. A to Supplemental Joint Status Report, Docket Sheet for *Head v. Petroleum Sols., Inc.*, Cause No. C-416-06-1 (398th Dist. Ct., Hidalgo County, Tex.) [Doc. # 91-1], at ECF page 7 (noting that counsel for Head had withdrawn and directing that, unless new counsel entered an appearance by June 24, 2016, PSI's motion for summary judgment would be granted).

[172]   *PSI v. Head*, 454 S.W.3d at 485.

[173]   *See, e.g.*, *Mid-Continent Cas. Co. v. Acad. Dev., Inc.*, 476 F. App'x 316 (5th Cir. 2012) (holding that alleged water leakage onto plaintiffs' properties constituted sufficient allegation of property damage to trigger insurer's duty to defend).

[174]   The Titeflex Judgment does not rest on a finding that PSI was liable to Head because, under Section 82.002(a), the duty to indemnify "is triggered by allegations of a defect in the manufacturer-indemnitor's product and is not dependent on an adjudication of the indemnitor's liability."  *PSI v. Head*, 454 S.W.3d at 492.

summary judgment in PSI's favor was entered in the State Court Litigation.[175] While the argument that coverage here depends on the outcome on Head's claims in the State Court Litigation is enticing, the Court ultimately is unconvinced because Mid-Continent's construction is contrary to the language of the Policy when read in its entirety.

Section I(A), "Coverage A – Bodily Injury and Property Damage Liability," describes the scope of the CGL coverage under the Policy for damage to a third party's property.[176] Section I(A) includes two subsections: "Insuring Agreement," section I(A)(1), and "Exclusions," section I(A)(2). Section I(A)(1)(a) provides the seminal coverage commitment by Mid-Continent: "We will pay those sums that the insured becomes legally obligated to pay as damages because of . . . 'property damage' to which this insurance applies. . . ." Section I(A)(1)(b) clarifies that "this insurance applies to . . . 'property damage'" and narrows the coverage to damage that meets the "occurrence," "coverage territory," and "policy period" requirements. The coverage expressly is restricted by elimination of certain circumstances set forth in section I(A)(2), the Policy's exclusions from coverage. The exclusions are introduced with the phrase "[t]his insurance does not apply

---

[175]   *See* Exh. B to Supplemental Joint Status Report, Order on Defendant Petroleum Solutions, Inc.'s Supplemental Motion for Summary Judgment and Motion to Reconsider, *Head v. Petroleum Sols., Inc.*, Cause No. C-416-06-1 (398th Dist. Ct., Hidalgo County June 27, 2016) [Doc. # 92-1].

[176]   Policy [Doc. # 63-2], at CGL Form pages 1–4 (ECF pages 14–17), § I(A). The CGL Form contains two additional coverage agreements that are not relevant to this dispute. *See id.*, at CGL Form page 5 (ECF page 18), § I(B) ("Coverage B – Personal and Advertising Injury Liability"); *id.*, at CGL Form pages 5–6 (ECF pages 18–19), § I(C) ("Coverage C – Medical Payments"); *see infra* Appendix, at 95.

to . . . ."[177]   The wording of these two sections thus contractually covers the universe of covered and excluded events.   Contrary to Mid-Continent's contentions, the phrase "to which this insurance applies," read in context, is a category of circumstances defined by subsections I(A)(1)(b)–(d), not an additional independent substantive restriction on the property damage within the scope of coverage.[178]   Indeed, Mid-Continent's argument falls by its own weight because, other than as a reference to subsections in sections I(A)(1) and (2), the phrase has no content.

Mid-Continent's argument that there is no coverage unless and until PSI suffers an adverse judgment regarding the property damage therefore fails.   Mid-

---

[177]   Policy [Doc. # 63-2], at CGL Form pages 1–4 (ECF pages 14–17), § I(A)(2); *see Weedo v. Stone-E-Brick*, 405 A.2d 788, 790 (N.J. 1979) ("The qualifying phrase, 'to which this insurance applies' underscores the basic notion that the premium paid by the insured does not buy coverage for all property damage[,] but only [buys coverage] for that type of damage provided for in the policy.   The limitations on coverage are set forth in the exclusion clauses of the policy, whose function it is to restrict and shape the coverage otherwise afforded."); *see generally* 7 COUCH ON INSURANCE § 101:7 (3d ed. 2015) ("'All-Risk' policies provide coverage for all risks unless the specific risk is excluded.   In an 'All-Risk' policy, the insured has the initial burden to prove that the loss occurred.   The burden then shifts to the insurer to prove that the cause of the loss is excluded by the policy.").   The question of the applicability of a Policy exclusion from coverage in determining an insurer's indemnity is distinct from the question of the insured's liability.   Indeed, an insured can be *liable* to another party for injuries or damages but be denied recovery because, in the second stage of the analysis, the benefits are excluded by the policy terms.

[178]   PSI argues that section I(A)(1)(d-*bis*), added to the Policy by the Professional Liability Endorsement [Doc. # 63-2], at ECF page 40, is a separate grant of coverage that is not tied to the requirements of Policy section I(A)(1)(a).   *See infra* Section IV.D.3.   Section I(A)(1)(d-*bis*), however, merely creates a definition of occurrence that is relevant to the analysis of Section I(A)(1)(b).   *See infra* Section IV.D.1.b.   The numbering of several amendments to the Policy overlaps with different provisions in the original text.   The Court uses "-*bis*" to distinguish the provision introduced by amendment.   *See generally infra* Appendix, at 94-97.

50

Continent cannot imply limitations on coverage into the general Policy language "to which this insurance applies."[179]  Accordingly, no formal or judicial finding of liability by PSI to Head is necessary for the damage to Head's property to constitute "'property damage' to which this insurance applies."[180]  Instead, for the purposes of "'property damage' . . . to which this insurance applies," the critical issues are whether the damage to Head's property was (1) caused by an "occurrence" in the "coverage territory" (2) within the applicable policy period.[181]

---

[179]   As discussed hereafter, *see infra* Section IV.D.2.b and note 228, several courts have concluded that coverage exists for amounts owed to a third party arising out of an incident resulting in damage where the insured was not ultimately found liable to the third party for that damage.  *See Spirco Envtl., Inc. v. Am. Int'l Specialty Lines Ins. Co.*, 555 F.3d 637 (8th Cir. 2009) (holding coverage existed for indemnification payment by contractor to its surety for surety's expenses in arbitration where contractor had prevailed in the arbitration); *Merrick Constr. Co. v. Hartford Fire Ins. Co.*, 449 So. 2d 85 (La. App. 1st Cir. 1984) (holding coverage existed for indemnification payment by contractor to its surety for surety's expenses in litigation where both contractor and surety were dismissed from litigation prior to trial).

[180]   At oral argument, Mid-Continent argued that the phrase "legally obligated to pay" narrows the scope of the phrase "to which this insurance applies."  Mid-Continent's contention is rejected.  The former phrase modifies the preceding noun, "those sums," and not the subsequent clauses of the sentence.  *See infra* Appendix, at 94.

[181]   The exclusions listed in Policy section I(A)(2) are not relevant to this coverage dispute.  Mid-Continent has not meaningfully sought to avoid coverage of the Titeflex Judgment on that basis.  The Court rejects Mid-Continent's argument in its Reply [Doc. # 74], at 10, regarding PSI's alleged admission of liability for the damage to Head's property. *See* PSI Reply [Doc. # 72], at 15 ("PSI's design and installation of the underground storage tank for Head led to the failure of the UST system . . .").  The statement merely addresses whether there is a causal link between PSI's professional services and the property damage.  That causation issue is discussed below.  *See infra* Section IV.D.1.e.  Therefore, the belated effort to apply exclusions from Policy section I(A)(2) fails.

51

### b. Occurrence

***Definition of "Occurrence."***— The Policy defines "occurrence" in section V, "Definitions," paragraph 13:

> "Occurrence" means an accident, including continuous or repeated exposure to substantially the same general harmful conditions.[182]

Under this definition, "[a]n 'occurrence' depends on the fortuitous nature of the event, that is, whether the damage was expected or intended from the standpoint of the insured."[183]  There is no evidence in the summary judgment record that the fuel leak from the fuel storage system PSI constructed was "expected or intended from the standpoint of [PSI]."[184]  Nor is it disputed that the fuel leak caused the property damage that is the subject of the underlying State Court Litigation, even if liability for that damage remains unresolved.  Therefore, there were events that qualify as an "accident" that caused property damage to Head's land.  That sequence of events satisfies the definition of "occurrence" under Policy section V(13).

***Coverage Territory.***— There is no dispute that Head's property at Silver Spur is in Texas and that Texas is within the "coverage territory."  There is, therefore, no genuine issue of material fact regarding section I(A)(1)(b)(1).

---

[182]   Policy [Doc. # 63-2], at CGL Form page 12 (ECF page 25), § V(13).

[183]   *Lamar Homes, Inc. v. Mid-Continent Cas. Co.*, 242 S.W.3d 1, 16 (Tex. 2007).

[184]   Mid-Continent suggests that the property damage was not accidental because Head pursued breach of contract and intentional tort claims against PSI in the State Court Litigation and elected not to recover on his negligence claim at trial.  Under Texas law, damage resulting from an intentional tort is not "accidental." *Lamar Homes*, 242 S.W.3d at 8.  The verdict on the breach of contract and intentional tort claims was vacated by the Texas Supreme Court.  On remand, the trial court entered summary judgment in favor of PSI.  Therefore, there has been no finding that the property damage at Silver Spur resulted from an intentional tort.  This argument that the property damage was not accidental is unavailing.

### c.  Policy Period

Policy section I(A)(1)(b)(2) requires that "property damage" occur during the "policy period" May 1, 2001 to May 2, 2002 (the "Policy Period").[185]  The Texas Supreme Court has interpreted the terms "occurrence" in section V(13) and "property damage" in section V(17), as used in section I(A)(1)(b)(ii), to mean, "property damage . . . occur[s] when actual physical damage to the property occurred."[186]  In Head's Second Amended Petition, the operative pleading in the State Court Litigation, he alleged that "[i]n November 2001, a release of diesel fuel occurred from the UST System."[187]  Mid-Continent does not argue that coverage is defeated because some property damage occurred outside the Policy Period, and any such argument is waived.[188]  Mid-Continent has not raised a genuine issue of material fact that the property damage in issue did not occur during the Policy Period.[189]

---

[185]   Policy [Doc. # 63-2], at CGL Form page 1 (ECF page 14), § I(A)(1)(b) (2)

[186]   *Don's Bldg. Supply, Inc. v. OneBeacon Ins. Co.*, 267 S.W.3d 20, 24 (Tex. 2008) ("The date that the physical damage is or could have been discovered is irrelevant.").

[187]   Exh. A29 to Mid-Continent Motion, Plaintiff's Second Amended Original Petition, *Bill Head v. Petroleum Sols., Inc.*, Cause No. C-416-06-I (398th Dist. Ct., Hidalgo County, Tex. Apr. 7, 2008) [Doc. # 68-33], at 2, ¶ 6.

[188]   Mid-Continent originally reserved the right to argue that the damage to Head's property resulted from an ongoing leak.  *See* Exhibit A10 to Mid-Continent Motion, Letter from Larry Liveringhouse to Mark Barron, dated May 21, 2001 [Doc. # 68-14], at 2 (reserving right to disclaim coverage if the fuel leak was not a "sudden and accidental" release).  Although Mid-Continent noted this reservation of rights in the facts section to its brief, it did not press the argument.  *See* Mid-Continent Motion [Doc. # 68-1], at 5.

[189]   To the extent Mid-Continent argues that there is an insufficient causal link *between* the 2001 property damage and the 2008 Titeflex Judgment, that issue is not relevant to the relationship between the property damage and the Policy Period. This argument pertains instead to the requirement in Policy section
(continued…)

53

### d.      Prior Knowledge of Property Damage

The Policy does not cover "property damage" of which the insured had knowledge "[p]rior to the policy period."[190]   There is no contention that PSI was aware of the fuel leak prior to the commencement of the Policy Period on May 1, 2001.

### e.      Professional Liability Endorsement

The Professional Liability Endorsement inserts an alternative route to satisfying the requirement of "'property damage' to which this insurance applies." The Endorsement creates an alternative definition of "occurrence":

> 'Bodily Injury', 'Property Damage' or 'Money Damages' arising out of the rendering or failure to render professional services *shall be deemed to be caused by an 'occurrence'*.[191]

Under the language of the Professional Liability Endorsement, "an 'accident' is not necessary to trigger coverage" because the verb "deemed" obviates the need to

---

(continued…)

I(A)(1)(a) that PSI became "legally obligated to pay . . . damages *because of* . . . 'property damage'" (emphasis added).  *See infra* Section IV.D.2.b.

Mid-Continent also argues that PSI's litigation decision refusing to dismiss with prejudice its claim against Titeflex should be considered in the determination of the threshold issue of the scope of coverage under sections I(A)(1)(a) and (b). This argument must instead be addressed in the framework of the contractual duty to cooperate.  *See supra* Section IV.C; *see also infra* Section IV.D.2.b.

Finally, Mid-Continent's contention that the date of entry of the Titeflex Judgment is the relevant date pertains to PSI's argument that the entirety of the Titeflex Judgment is covered as "Money Damages" under the Professional Liability Endorsement.  *See infra* Section IV.D.3.

[190]   Policy [Doc. # 63-2], at ECF page 28, Amendment of Insuring Agreement – Known Injury or Damage, § I(A)(1)(b)(iii).

[191]   Policy [Doc. # 63-2], at ECF page 40, § I(A)(1)(d-*bis*) (emphasis added).

point to an actual event.[192]   If the damage to Head's land arose out of PSI's professional services, then the requirement in the Insuring Agreement, Policy section I(A)(1)(b)(1), that the property damage be "caused by an 'occurrence'" is satisfied.  If this "occurrence" also meets the coverage territory, policy period, and prior knowledge requirements, then the terms of "'property damage' to which this insurance applies" are satisfied.

  ***Whether PSI Rendered "Professional Services."***— Although the Policy does not define "professional services," the phrase has acquired an established definition in Texas insurance law.  To constitute a professional service, "the task must arise out of acts particular to the individual's specialized vocation, [and] . . . it must be necessary for the professional to use his specialized knowledge or training."[193]   The design and installation of a fuel storage tank are acts particular to PSI's specialization in the field of petroleum storage systems, and thus are professional services.   Mid-Continent does not meaningfully dispute that the design and installation of the fuel tank on Head's property constitutes "professional services."[194]

---

[192] *See Jackson v. McKay-Davis Funeral Home, Inc.*, 717 F. Supp. 2d 809, 819 (E.D. Wis. 2010) (interpreting identical language regarding occurrences in a professional services endorsement).

[193] *Nat'l Cas. Co. v. W. World Ins. Co.*, 669 F.3d 608, 615 (5th Cir. 2012) (quoting *Admiral Ins. Co. v. Ford*, 607 F.3d 420, 425 (5th Cir. 2010)).

[194] *See* Mid-Continent Motion [Doc. # 68-1], at 21 ("PSI arguably rendered professional services when it installed the fuel tank at Silver Spur . . . ."). At oral argument, Mid-Continent contended that the Titeflex Judgment does not arise out of "professional services" because it concerns the manufacturer-seller relationship between PSI and Titeflex.  Mid-Continent suggested that the Professional Liability Endorsement only applies to claims involving allegations regarding "professional services." That argument focuses on the wrong causal chain.  The "occurrence" exists because property damage arose out of professional services.   Mid-
                 (continued…)

***Whether the Property Damage Arose out of Professional Services.***— For "property damage" to be caused by an "occurrence" for purposes of the Professional Liability Endorsement, the damage to Head's property must "aris[e] out of" PSI's rendering of the professional services of designing and installing the fuel tank.  Texas insurance law defines "arising out of" broadly.  The phrase requires "that there is simply a 'causal connection or relation,' which is interpreted to mean that there is but for causation, though not necessarily direct or proximate causation."[195]  There is no dispute the 20,000 gallons of oil leaked from the tank that PSI installed.  Property damage to Head's land would not have occurred but for the design and installation of that fuel tank.  Thus, the damage to Head's property "arose out of" PSI's work,[196] and, under the terms of the Professional Liability Endorsement, the property damage in issue in the State Court Litigation is deemed to have been caused by an occurrence.

***Coverage Territory, Policy Period, and Prior Knowledge.***— The relationship between PSI's professional services and the damage to Head's property meets the Professional Liability Endorsement's definition of "occurrence."  As previously explained, this property damage was within the coverage territory and occurred within the Policy Period.  PSI did not have prior knowledge of the property damage.

---

(continued…)

Continent's argument relates to whether the Titeflex Judgment is "because of" that property damage.  *See infra* Section IV.D.2.b.

[195]  *Utica Nat'l Ins. Co. of Tex. v. Am. Indem. Co.*, 141 S.W.3d 198 (Tex. 2004) (quoting *Mid-Century Ins. Co. v. Lindsey*, 997 S.W.2d 153, 156 (Tex. 1999)); *id.* (noting further that "[o]ther jurisdictions also interpret 'arising out of' to exclude a proximate cause requirement").

[196]  This, however, is not a conclusion or finding that PSI is liable to Head.

###### f.     Conclusion on "'Property Damage' to Which This Insurance Applies"

The damage to Head's property satisfies the elements of Policy section I(A)(1)(b).  The damage was caused by an occurrence pursuant to the terms of the original Policy and the terms of the Professional Liability Endorsement.  The property damage occurred within the Policy Period.  Therefore, the damage to Head's property is "'property damage' to which this insurance applies."  Coverage may be available for the Titeflex Judgment *if* PSI became legally obligated to pay it as "damages because of" that property damage, *or if* the Professional Liability Endorsement creates additional forms of coverage, subjects to which the Court now turns.

###### 2.     Section I(A)(1)(a): "Damages Because of . . . 'Property Damage'"

In Policy section I(A)(1)(a), Mid-Continent agrees to pay "those sums that the insured becomes legally obligated to pay as damages because of . . . 'property damage' to which this insurance applies."[197]   As explained above, damage to Head's property is "'property damage' to which this insurance applies."  This coverage dispute raises two additional questions regarding section I(A)(1)(a): (1) whether the Titeflex Judgment constitutes "damages"; and (2) whether PSI became legally obligated to pay the Titeflex Judgment "because of" the damage to Head's property.

###### a.     Damages

Only the portion of the Titeflex Judgment awarded pursuant to Section 82.002(a) constitutes covered "damages" under the Policy.  As discussed earlier,[198]

---

[197]     Policy [Doc. # 63-2], at CGL Form page 1 (ECF page 14), § I(A)(1)(a).

[198]     *See supra* Section IV.B.2.

there are two authorized components of the Titeflex Judgment: (1) indemnification under Section 82.002(a) for the loss (*i.e.*, attorney's fees, expenses and costs) Titeflex incurred in defending against Head's claims; and (2) Titeflex's recovery under Section 82.002(g) for its fees, expenses and costs incurred in successfully prosecuting its Section 82.002(a) claim against PSI.[199]   As explained below, the first constitutes "damages" under Texas law and the Policy, but the second does not.

   ***Whether Attorney's Fees May Constitute "Damages" Under the Policy.***— The Policy does not define "damages."   The parties and Court must look to Texas law to define "damages."   Mid-Continent relies on the general Texas rule summarized in *In Re Nalle Plastics Family Limited Partnership*[200] that attorney's fees do not constitute compensatory damages.[201]   PSI relies on an exception to this

---

[199]   *See* Exh. A42 to Mid-Continent Motion, Second Amended Counter Claims of Defendant, Titeflex Corporation, Against Petroleum Solutions, Inc., *Bill Head v. Petroleum Sols., Inc.*, Cause No. C-416-06-I (398th Dist. Ct., Hidalgo County, Tex. Sept. 15, 2008) [Doc. # 68-46], at 4 ("Titeflex is entitled to recover from PSI all past and future costs of court, reasonable expenses, and reasonable and necessary attorney's fees which were expended in defense of this action *and in prosecution of this demand for indemnity*." (Emphasis added)); Exh. A44 to Mid-Continent Motion, Final Judgment, *Bill Head v. Petroleum Sols., Inc.*, Cause No. C-416-06-I (398th Dist. Ct., Hidalgo County, Tex. Jan. 13, 2009) [Doc. # 68-48], at 3 (awarding Titeflex "attorney fees for services rendered *through the trial of this case*" (emphasis added)).   The Court has held above that attorney's fees, expenses and costs associated solely with Titeflex's defense against PSI's Affirmative Claim are not losses indemnifiable under Section 82.002(a).   *See supra* notes 93-101 and accompanying text.

[200]   406 S.W.3d 168, 171 (Tex. 2013)

[201]   *See* Mid-Continent Motion [Doc. # 68-1], at 18 & n.105 (citing *In re Nalle*, 406 S.W.3d at 171).

rule, also recognized by *In re Nalle*, for attorney's fees awarded as damages pursuant to a substantive cause of action.[202]

The general rule excluding attorney's fees from compensatory damages is based on statutory interpretation of § 38.001 of the Texas Civil Practice and Remedies Code.  That statute is a fee-shifting provision that permits recovery of attorney's fees in certain actions "in addition to the amount of a valid claim and costs."[203]  The use of "in addition to" in this statute evidences that attorney's fees are a form of recovery separate from compensatory damages.[204]

Attorney's fees are deemed "compensatory damages" where they are a loss recovered through an independent cause of action.   Certain attorney's fees recovered in *In re Nalle* constituted damages for breach of contract.  The Texas Supreme Court explained:

> While attorney's fees in prosecuting this claim are not compensatory damages, the fees comprising the breach-of-contract damages are.  If the *underlying* suit concerns a claim for attorney's fees as an element of damages, . . . then those fees may properly be included in a judge or jury's compensatory damages award.[205]

---

[202]   *See* 406 S.W.3d at 174 ("reject[ing] the idea that attorney's fees can *never* be considered compensatory damages").

[203]   Tex. Civ. Prac. & Rem. Code § 38.001.

[204]   *In re Nalle*, 406 S.W.3d at 172–73 ("[S]uits cannot be maintained solely for the attorney's fees; a client must gain something *before* attorney's fees can be awarded.").

[205]   *Id.*, at 175 (interpreting "compensatory damages" in Texas supersedeas bond statute); *see also Richardson v. Wells Fargo Bank, N.A.*, 740 F.3d 1035, 1038 (5th Cir. 2014) ("For example, attorney's fees are considered damages if the fees are incurred in litigation with a third party, or if the fees are unpaid legal bills sought in a breach of contract action against a client, or if the fees are expended before litigation to obtain title from a third party to whom defendants had wrongfully transferred title."); *Akin, Gump, Strauss, Hauer & Feld, L.L.P. v. Nat'l Dev. & Research Corp.*, 299 S.W.3d 106, 111 (Tex. 2009) ("We also agree with NDR that (continued…)

***Whether Attorney's Fees Awarded Under Section 82.002 for Indemnification Constitute Damages.***— An award of attorney's fees under Section 82.002(a) is an award of compensatory damages.   Section 82.002(a) provides compensation for a "loss arising out of a products liability action." Section 82.002(b) defines "loss" to include "court costs and other expenses, reasonable attorney fees, and any reasonable damages."[206]   Section 82.002(a) creates an independent cause of action that, as the Titeflex Judgment exemplifies, may comprise solely attorney's fees, expenses and court costs incurred in defense of claims by a third party in an underlying products liability action.[207]   The portion of the Titeflex Judgment awarded pursuant to Section 82.002(a) constitutes "damages" under *In re Nalle* and therefore constitutes "damages" for purposes of Policy section I(A)(1)(a).

In contrast, attorney's fees, expenses and costs awarded to Titeflex pursuant to Section 82.002(g) incurred in *prosecuting* its Section 82.002(a) claim against PSI for indemnity do not meet the definition of compensatory "damages" under prevailing law.   Section 82.002(g) fees are ancillary to recovery on the substantive cause of action created by Section 82.002(a).   Section 82.002(g) is a fee-shifting

---

(continued…)

it may recover damages [in legal malpractice action] for attorney's fees it paid to its attorneys in the underlying suit to the extent the fees were proximately caused by the defendant attorneys' negligence." (footnote omitted)).

[206]   *Cf. Damages*, BLACK'S LAW DICTIONARY (10th ed. 2014) (defining "damages" as "[m]oney claimed by, or ordered to be paid to, a person as compensation for *loss* or injury" (emphasis added)).

[207]   This is unlike § 38.001 of the Texas Civil Practice and Remedies Code, which requires the plaintiff to prevail on an underlying substantive claim.

provision for successful claims against a product manufacturer.[208]  The component of the Titeflex Judgment comprising the fees, expenses and costs incurred under Section 82.002(g) for successfully prosecuting the claim against PSI for indemnification as an innocent seller of a component of PSI's product is not a covered loss as "*damages* because of . . . 'property damage.'"  The precise fees, expenses and costs attributable to Titeflex's Section 82.002(g) recovery will need to be ascertained at trial.[209]

Citing cases that interpreted "damages" to include both compensatory and punitive damages, PSI argues that "damages" also includes a fee-shifting award. Punitive damages are a form of damages long recognized in the law.  The analysis in the cited authorities concerned issues specific to punitive damages, such as whether insurance coverage for punitive damages contravenes public policy.[210]

---

[208]  Section 82.002(g), as a fee-shifting provision, is comparable to Section 38.001 of the Texas Civil Practice and Remedies Code.

PSI incorrectly contends that Section 82.002(g) "specifically refers to the recovery of attorneys' fees by a seller as damages."  PSI Motion [Doc. # 63], at 26. Subsection (g) in fact refers to recovery of "reasonable attorney fees" separate from "reasonable damages" incurred to enforce the Section 82.002(a) claim.

[209]  *See supra* note 108 and accompanying text.

[210]  *See, e.g., Westchester Fire Ins. v. Admiral Ins.*, 152 S.W.3d 172, 182–91 (Tex. App.—Fort Worth 2004, pet. denied) (holding that insurance coverage of punitive damages was not contrary to public policy); *Am. Home Assur. Co. v. Safway Steel Prods. Co.*, 743 S.W.2d 693, 701 (Tex. App. 1987, writ denied) (rejecting argument that an award of punitive damages is not covered because "injuries resulting from grossly negligent conduct are either intended or expected from the insured's standpoint"); *see also Am. Int'l Specialty Lines Ins. Co. v. Res-Care, Inc.*, 529 F.3d 649, 661–62 n.29 (5th Cir. 2008) (noting the holding in *Safway Steel*, but not reaching the question of whether punitive damages are covered as "damages"); *Philadelphia Indem. Ins. Co. v. Stebbins Five Cos.*, Civ. A. No. 3:02-cv-1279-M, 2004 WL 210636 (N.D. Tex. Jan. 27, 2004) (applying *Safway Steel*).

61

PSI fails to explain how the analysis and conclusions regarding punitive damages apply to the wholly distinct concept of fee-shifting.[211]

PSI also cites three cases in which it contends the courts found attorney's fees to be "damages." These cases are uninformative and unpersuasive. The issue of whether a fee-shifting award constitutes damages was either not raised or was not meaningfully analyzed by these courts. In *Home Owners Management Enterprises, Inc. v. Mid-Continent Casualty Co.*, Magistrate Judge Stickney in the Northern District of Texas included in the covered amount the attorney's fees awarded against the insured in the underlying litigation.[212] It does not appear,

---

[211]   PSI suggests that the Court should not make a distinction between compensatory and non-compensatory damages. PSI Recon. Reply [Doc. # 101], at 6. PSI urges that it would be error to conclude that, because a fee-shifting award is not compensatory damages, it is not "damages" under the Policy. PSI argues that the fee-shifting award constitutes a form of non-compensatory damages. Under Texas law, however, attorney's fees are considered "costs." *See, e.g., Alma Grp., L.L.C. v. Palmer*, 143 S.W.3d 840, 846 (Tex. App. 2004) ("Palmer argues that the attorney fees are damages. However, attorney fees are in the nature of costs, not damages."), *cited in In re Nalle*, 406 S.W.3d at 172 n.5. There is disagreement among jurisdictions regarding this classification, but the Court must follow Texas law. *Compare Bd. of Cnty. Comm'rs of Larimer Cnty. v. Guarantee Ins. Co.*, 90 F.R.D. 405, 407 (D. Colo. 1981) (noting that attorney's fees were not covered as "damages because of injury" in civil rights suit because they are considered "costs"), *with City of Ypsilanti v. Appalachian Ins. Co.*, 547 F. Supp. 823 (E.D. Mich. 1982) ("It is reasonable to say that an attorney fee award in a civil rights suit is a form of 'damage' which the defendant contracted to cover."). The Policy addresses "costs" separately from "damages." *See* Policy [Doc. # 63-2], at CGL Form page 6 (ECF page 19), § I, Supplementary Payments – Coverages A and B, 1(e) ("We will pay, with respect to any claim we investigate or settle, or any 'suit' against an insured we defend: . . . All costs taxed against the insured in the 'suit'."). The Court does not reach the question of whether fees awarded under Section 82.002(g) would constitute "costs taxed against" PSI under the supplementary payment section of the Policy.

[212]   *Home Owners Mgmt. Enters., Inc. v. Mid-Continent Cas. Co.*, No. 3:04-cv-2061-BFH, 2005 WL 2452859, at *7, *9 (N.D. Tex. Oct. 3, 2005) (Stickney, M.J.), *aff'd* 294 F. App'x 814 (5th Cir. 2008). Mid-Continent asserts that the Fifth Circuit
(continued…)

however, that the insurer disputed this point.[213]   The court neither analyzed the issue nor cited any authority for its conclusion.

In *Landstar Homes Dallas, Ltd. v. Mid-Continent Casualty Co.*, a district court in the Northern District of Texas held that a duty to indemnify existed regarding an arbitration award that included an award of attorney's fees and expenses against the insured to the injured third party.[214]   Although the insurer disputed the "breakdown for covered and uncovered attorneys' fees from the underlying claim," the district court stated that this argument "relate[d] to potential damage calculations" and did not reach the present issue in granting summary

---

(continued…)
held that the issue of the classification of attorney's fees had been waived.  The Fifth Circuit, however, simply did not address this issue.  The discussion of waiver cited by Mid-Continent concerned whether "legally obligated to pay" was restricted to tort liability only, or could also include an award based on breach of contract.  *See* 294 F. App'x at 817–18.

[213]  *See* Defendant Mid-Continent Casualty Company's Motion for Summary Judgment, *Home Owners Mgmt. Enters., Inc. v. Mid-Continent Cas. Co.*, No. 3:04-cv-2061-BFH (N.D. Tex. Aug. 26, 2005), ECF No. 35, at 23 (arguing that attorney's fees could not be "characterized as damages because of 'property damage' caused by an 'occurrence'" because the underlying damages for "cost of repair" were, according to Mid-Continent, not covered by the policy).  PSI suggests that the insurer in *Home Owners Management* independently contested the classification of fee-shifting as "damages."  *See* PSI Recon. Reply [Doc. # 101].  PSI misunderstands the insurer's argument, which argument was merely an extension of its point that the underlying damage was not within the scope of the term "damages . . . because of 'property damage.'"

[214]  *Landstar Homes Dallas, Ltd. v. Mid-Continent Cas. Co.*, No. 3:10-cv-0014-K, 2010 WL 5071688, at *7 (N.D. Tex. Dec. 13, 2010).

63

judgment on the insurer's liability.[215]   It also does not appear that the insurer disputed whether attorney's fees constitute "damages" under Texas law.[216]

In *Mid-Continent Casualty Co. v. Castagna*, the Dallas Texas Court of Appeals affirmed a finding of coverage for an arbitration award that included an award of attorney's fees under Texas Civil Practice and Remedies Code § 38.001.[217]   It appears that the insurer did not raise on appeal the issue of whether this fee-shifting was "damages," nor did the court of appeals address it.   Rather, the insurer argued that the policy's *contractual liability exclusion* applied because the arbitrator's award of attorney's fees under § 38.001 indicated that the arbitrator treated a potentially covered breach of implied warranty claim as a contract claim.[218]

Possibly more significantly, *Home Owners Management* and *Landstar Homes* were decided eight and three years, respectively, before the Texas Supreme Court's decision in *In re Nalle*.   The question presented in *Castagna* was unrelated to the classification of a fee-shifting award as "damages" and that court did not even cite *In re Nalle*.

---

[215]   *Id.*

[216]   *See* Defendants Mid-Continent Casualty Company's and Great American Insurance Company's Brief in Support of Their Motion for Summary Judgment, *Landstar Homes Dallas, Ltd. v. Mid-Continent Cas. Co.*, No. 3:10-cv-0014-K (N.D. Tex. Sept. 30, 2010), ECF No. 33.

[217]   *Mid-Continent Casualty Co. v. Castagna*, 410 S.W.3d 445, 460 (Tex. App.—Dallas 2013, pet. denied).

[218]   *Id.* ("Mid-Continent argues that the damages were to the subject of the construction contract—the residence, and by awarding attorneys' fees under section 38.001 of the civil practice and remedies code, the arbitrator 'treated' the breach of implied warranty as a contract claim.").

None of PSI's cited authorities are probative of the legal question presented in the coverage dispute at bar: whether recovery under a fee-shifting provision constitutes "damages" under Texas law.   The Texas Supreme Court squarely addressed this issue in *In re Nalle*.   PSI's arguments that the principle in *In re Nalle* should not apply to the interpretation of an insurance policy are unpersuasive.[219]

### b.    "Because of"

***General Principles.—***   The Section 82.002(a) damages claimed by Titeflex may be covered under the Policy if PSI became legally obligated to pay them as "damages *because of* . . . 'property damage'" (emphasis added).   "Because of" means "[b]y reason of, on account of."[220]   In particular, "because of . . . 'property damage'" includes both compensation for the property damage *and* consequential damages stemming from the property damage.[221]   "Because of" has been very broadly construed in Texas and elsewhere.

A key aspect of the parties' dispute is whether "damages because of . . . 'property damage'" includes Section 82.002 statutorily required reimbursement by a defendant manufacturer of a co-defendant seller's attorney's fees, expenses and

---

[219]    In ascertaining the law of the forum state, a federal court "is bound to apply the law as interpreted by the state's highest court."  *Ladue v. Chevron U.S.A., Inc.*, 920 F.2d 272, 274 (5th Cir. 1991).

[220]    *Because*, OXFORD ENGLISH DICTIONARY (2016); *see also Because of*, MERRIAM-WEBSTER ONLINE (2016) ("by reason of; on account of").  The Texas Supreme Court has recognized that the phrase "because of" in a CGL policy is "susceptible to a broad definition."  *Zurich Am. Ins. Co. v. Nokia, Inc.*, 268 S.W.3d 487, 499 (Tex. 2008); *see also Brainard v. Trinity Universal Ins. Co.*, 216 S.W.3d 809, 814 (Tex. 2006) (holding that prejudgment interest was covered as "damages because of bodily injury").

[221]    *See Nat'l Union Fire Ins. Co. of Pittsburgh, Pa. v. Puget Plastics Corp.*, 532 F.3d 398, 403 (5th Cir. 2008).

costs incurred when the latter must defend against products liability litigation instituted by a third-party plaintiff who suffered property damage related to the manufacturer's product.    Neither party has cited authority, and the Court independently has located none, that addresses whether a CGL policy covers a judgment pursuant to Section 82.002(a) or a similar indemnification obligation arising out of a products liability suit.   The Court   applies Texas law on the "because of" requirement in CGL polices.[222]

*The Titeflex Judgment as "Consequential Damages."—* The Titeflex Judgment arose because of Head's property damage at issue in the State Court Litigation.   Head alleged that Titeflex's product had been a cause of that property damage.[223]   Titeflex would not have been sued but for that property damage.   The definition of "products liability action" in Texas Civil Practice and Remedies Code § 82.001(2), on which Section 82.002 remedies are based, requires that underlying products liability action "aris[e] out of personal injury, death, or *property damage*."[224]   The attorney's fees, expenses and costs Titeflex incurred in defending against Head's claims (charged against PSI under Section 82.002(a)) thus were a

---

[222]   Mid-Continent has acknowledged that it is unable to locate *any* authority adopting a narrower interpretation of "because of."   *See* Mid-Continent Post-Argument Brief [doc. # 90], at 2 ("Mid-Continent has not located any case where 'because of' was found to be more narrowly construed than Titeflex's fees in defense of PSI's products liability claim.").

[223]   In his amended pleading, Head alleged, "Titeflex is strictly liable for damages caused by the defective flex connector."   Exh. A24 to Mid-Continent Motion, Plaintiff's First Amended Original Petition, *Bill Head v. Petroleum Sols., Inc.*, Cause No. C-416-06-I (398th Dist. Ct., Hidalgo County, Tex. Jan. 30, 2007) [Doc. # 68-28], at 3, ¶ 9.   The First Amended Original Petition further alleged that Head had performed "an emergency response cleanup" upon learning of the leak and that "Titeflex and Petroleum Solutions, Inc. are responsible for the cleanup costs." *Id.*, at 4, ¶¶ 10–11.

[224]   TEX. CIV. PRAC. & REM. CODE § 82.001(2) (emphasis added).

"loss," under Section 82.002(a) and "damages" under the Policy that PSI incurred "because of" Head's property damage.[225]

Reinforcing this interpretation is the fact that the Titeflex Judgment, to the extent it includes Section 82.002(a) fees, expenses and costs, is comparable to other forms of consequential damages that have been found by Texas courts to be within the scope of "damages because of . . . 'property damage,'" such as lost profits, diminution in value, and miscellaneous economic costs associated with responding to the original property damage.[226]   The amounts of these other forms

---

[225]   *See supra* Section IV.D.2.a (analyzing Section 82.002(a) and contrasting Titeflex's recovery of attorney's fees, expenses and costs pursuant to Section 82.002(g)'s fee-shifting provision, which are not "damages" under law or the Policy).

[226]   *See Puget Plastics*, 532 F.3d at 403 (holding that policy providing coverage for damages "because of" property damage encompassed "lost profits and diminution in value" (Texas law)); *Acad. Dev., Inc.*, 476 F. App'x at 319 ("[T]he 'damages because of . . . property damage' provision in a CGL policy includes recovery sought for economic losses, such as diminution in value, that are 'attributable' to property damage." (Texas law)); *cf. Brainard*, 216 S.W.3d at 814 (holding that prejudgment interest was covered as "damages because of bodily injury").

The Fifth Circuit's interpretation of "because of" is consistent with other jurisdictions.  *See, e.g.*, *Wausau Underwriters v. United Plastics Grp.*, 512 F.3d 953, 956–57 (7th Cir. 2008) ("As in tort law, so in liability-insurance law, once there is damage to property the victim can recover the nonproperty, including business, losses resulting from that damage and not just the diminution in the value of the property." (Illinois law)); *Am. Home Assur. Co. v. Libbey-Owens-Ford Co.*, 786 F.2d 22, 26 (1st Cir. 1986) ("[E]ven the post-1973 version of the Comprehensive General Liability Policy, which restricts property damage to 'physical injury to tangible property' has been interpreted by courts and commentators to cover consequential damages resulting from such physical damage."); *Netherlands Ins. Co. v. Main St. Ingredients, LLC*, No. CIV. 11-533 DSD/FLN, 2013 WL 101876, at *5 (D. Minn. Jan. 8, 2013) ("[The insurer] argues that the damages [the plaintiff in the underlying litigation] sought—destroyed inventory, credits and fees to customers, recall freight and additional costs—are purely economic and not property damage. . . .  The Policy, however, covers not only property damage, but damages [the insured] must pay *because of* property

(continued…)

of economic consequential damages are calculated independently, in ways different from the direct damages covered by a CGL policy. It thus is immaterial that the amount of Titeflex's judgment is not measured by the damage to Head's property.[227]  The Section 82.002(a) portion of the Titeflex Judgment constitutes "damages" "because of" "property damage."[228]

---

(continued…)
damage."), *aff'd*, 745 F.3d 909 (8th Cir. 2014); *Conn. Ins. Guar. Ass'n v. Fontaine*, 900 A.2d 18 (Conn. 2006) (finding "because of bodily injury" ambiguous and adopting more expansive reading that required coverage of loss of consortium claim).

[227]   *See Puget Plastics*, 532 F.3d at 403.

[228]   This conclusion also is reinforced by decisions of courts in other jurisdictions that granting CGL coverage for the indemnification obligation of a principal (the insured under the CGL policy) due to its surety. *See Merrick Constr. Co. v. Hartford Fire Ins. Co.*, 449 So. 2d 85 (La. App. 1st Cir. 1984) (Louisiana law); *Spirco Envtl. Inc. v. Am. Int'l Specialty Lines Ins. Co.*, 555 F.3d 637 (8th Cir. 2009) (Missouri law). Each court held that a CGL policy covered a principal's indemnification of attorney's fees incurred by its surety in defending a claim involving the insured's alleged wrongdoing or omission as to an obligee in the surety relationship. The tripartite relationship between an injured plaintiff, manufacturer, and seller in a products liability dispute is analogous to the suretyship relationship among an obligee (the injured party), a principal (the party that fails to perform an obligation), and a surety (who must make the obligee whole by contract or law). A product-component seller in Texas, here, Titeflex, that suffers a "loss" under Section 82.002(a) solely because of its innocent involvement in a supply chain is comparable to a surety sued for the principal's conduct. Section 82.002 provides to the innocent seller the equivalent of a surety's right of action against its principal, the manufacturer. Thus, these cases ordering CGL coverage for the surety are instructive.

Mid-Continent refers the Court to an intermediate Texas court's opinion in *Armstrong v. Anderson*, 91 S.W.2d 775, 780 (Tex. App.—El Paso 1936), *rev'd on other grounds*, 120 S.W.2d 444 (Tex. Comm'n App. 1938, opinion adopted), which held that:

> The general rule is that when a surety is forced to pay the debt of his principal a promise on the part of the principal to repay him the amount so paid is implied and that the surety becomes a simple contract creditor of the
> (continued…)

*Post-Occurrence Litigation Decisions as Part of Coverage Analysis.*—
Mid-Continent argues that the Titeflex Judgment was caused by PSI's decision to
reject the Settlement Offer, *i.e.*, the mutual dismissal with prejudice of the claims
between itself and Titeflex, and not because of the damage to Head's property.[229]
That contention is rejected.

Various doctrines of insurance law govern the impact of post-occurrence
litigation decisions on the insurer's and the insured's rights.  Examples of policy
provisions governing the insurance relationship during litigation can be found in
the Policy in "Duties In The Event Of Occurrence, Offense, Claim or Suit,"

---

(continued…)

  principal.  We know of no rule of law which allows a simple contract
  creditor to recover attorney's fees.

The *Armstrong* court did not address insurance coverage at all.  That court
acknowledged the concept of indemnity owed by a principal for "damages"
suffered by its surety.  The court rejected the surety's claim for its attorney's fees
sought from the principal under a contract held unenforceable. Here, the Section
82.002(a) award to Titeflex is comparable to the principal's duty to repay the
surety for the basic indemnity payments required by law.

[229] Mid-Continent Motion [Doc. # 68-1], at 21 ("PSI's failure to consent to a
dismissal of the third-party claim against Titeflex is what caused the Titeflex
Judgment."); Mid-Continent Reply [Doc. # 74], at 8 ("[L]itigation decisions can
result in a judgment against an insured, just like PSI's litigation decisions in the
[State Court Litigation] resulted in the Titeflex Judgment being entered against
it. . . .  [T]he Titeflex Judgment was rendered against PSI because it refused to
settle . . . .").

At oral argument, Mid-Continent contended that PSI's independent counsel
imbricated coverage and litigation decisions in his August 18, 2008 letter.  *See*
Exh. 29 to PSI Motion, Letter from Michael A. McGurk to Robert Bryant, dated
Aug. 18, 2008 [Doc. # 63-31].  PSI's independent counsel argues in this letter that
Mid-Continent should have been more willing to *settle* the State Court Litigation
because its agents were responsible for the loss of the flex connector.  The letter
does not suggest that any party's litigation decision creates or voids coverage
under the terms of the Insuring Agreement, Policy section I(A)(1)(a).

subsections IV(2)(b)–(d).[230]   These clauses, respectively, require the insured to provide to the insurer notice of the claim, require the insured's cooperation with and assistance to the carrier in certain aspects of the litigation related to the claim, and impose restrictions on the insured's ability to settle the claim.   These provisions include detailed requirements following the inception of a lawsuit against the insured.   Each of these provisions has acquired legal meaning and judicial gloss that govern its scope.[231]

---

[230]   Policy [Doc. # 63-2], at CGL Form page 9 (ECF page 22), § IV(2)(b)–(d); *see infra* Appendix, at 95-96.

[231]   Regarding the notice requirements in Policy section IV(2)(b), Texas courts have established standards for compliance.   *See, e.g., E. Tex. Med. Ctr. Reg'l Healthcare Sys. v. Lexington Ins. Co.*, 575 F.3d 520, 525 (5th Cir. 2009) ("no level of detail is specifically required" and presence of forwarding papers requirement "suggests notice of the claim was not designed to bear the entire informational burden"); *PAJ, Inc. v. Hanover Ins. Co.*, 243 S.W.3d 630, 636–37 (Tex. 2008) (holding that "an insured's failure to timely notify its insurer of a claim or suit does not defeat coverage if the insurer was not prejudiced by the delay"); *Nat'l Union Fire Ins. Co. of Pittsburgh, Pa. v. Crocker*, 246 S.W.3d 603, 609 (Tex. 2008) (holding that an insurer's actual knowledge of a suit against an additional insured who failed to comply with notice-of-suit provisions does not preclude a finding of prejudice); *Pioneer Cas. Co. v. Blackwell*, 383 S.W.2d 216, 219 (Tex. Civ. App.—Waco 1964, writ ref'd n.r.e.) (noting the definition of "immediately" as "within a reasonable time under the circumstances").

As to Policy section IV(2)(c), the duty to cooperate, courts have imposed a requirement that an insurer show that it was prejudiced by a violation of the duty to cooperate and have rejected attempts by insurers to require absolute cooperation.   *See supra* Section IV.C.   Courts also have required efforts by the insurer to obtain cooperation from the insured.   *See, e.g., Wiles v. Capitol Indem. Corp.*, 215 F. Supp. 2d 1029, 1031 (E.D. Mo. 2001) ("insurer must prove . . . the exercise of reasonable diligence to secure cooperation before it can deny coverage"); *Admiral Ins. Co. v. Grace Indus., Inc.*, 409 B.R. 275, 283 (E.D.N.Y. 2009) (noting insurer must act diligently with efforts reasonably calculated to secure the insured's cooperation).

Finally, regarding Policy section IV(2)(d), a prohibition against an insured settling the matter without the insurer's agreement, it is clear that the insurer may

(continued…)

In addition, case law imposes extra-contractual duties on and grants additional rights to the insurer, the insured, and their counsel in litigating a potentially covered claim.[232]   For example, an insured is entitled to independent counsel at the insurer's expense if a conflict of interest precludes the insurer from controlling the insured's defense.[233]   Similarly, a New York court found that the insured could make independent reasonable litigation decisions where defense of covered claims could have increased the insured's exposure to liability on claims not covered by the policy.[234]   "[T]hough the insured is contractually precluded from settling a case, or otherwise assuming an obligation, without the consent of

(continued…)
contractually bar the insured from entering a settlement without the insurer's consent, but the insurer has a legal duty to accept a reasonable settlement offer. *See G.A. Stowers Furniture Co. v. Am. Indem. Co.*, 15 S.W.2d 544 (Tex. Comm'n App. 1929, holding approved); *AFTCO Enters., Inc. v. Acceptance Indem. Ins. Co.*, 321 S.W.3d 65, 69 (Tex. App.—Houston [1st Dist.] 2010, pet. denied).

[232]   These duties include, for example, the insurer's duties to investigate thoroughly and to disclaim coverage promptly.  *See, e.g.*, *United Neurology, P.A. v. Hartford Lloyd's Ins. Co.*, 101 F. Supp. 3d 584, 593–94 (S.D. Tex.), *aff'd*, 624 F. App'x 225 (5th Cir. 2015) (citing *Viles v. Security Nat'l Ins. Co.*, 788 S.W.2d 566, 568 (Tex. 1990)) (noting that the law "imposes upon the insurer a duty to investigate thoroughly and in good faith"); *N. Am. Capacity Ins. Co. v. Brister's Thunder Karts, Inc.*, 287 F.3d 412, 414 (5th Cir. 2002) (affirming decision that insurer who waited three years to inform insured of intent to deny coverage had violated the duty to disclaim coverage).

[233]   *See, e.g.*, *Hous. Auth. of City of Dallas v. Northland Ins. Co.*, 333 F. Supp. 595, 600–02 (N.D. Tex. 2004) (Lindsay, J.).  Under Texas law, "[a] conflict of interest exists that prevents the insurer from insisting on its contractual right to control the defense when the insurer has reserved its rights and the facts to be adjudicated in the liability lawsuit are the same facts upon which coverage depends." *Allstate Cnty. Mut. Ins. Co. v. Wootton*, No. 14-14-00657-CV, 2016 WL 1237872, at *9 (Tex. App.—Houston [14th Dist.] Mar. 29, 2016) ((citing *N. Cnty. Mut. Ins. Co. v. Davalos*, 140 S.W.3d 685, 688 (Tex. 2004))).

[234]   *Nelson Elec. Contracting Corp. v. Transcont'l Ins. Co.*, 660 N.Y.S.2d 220, 222 (N.Y. App. Div. 1997).

71

the insurance company, these limitations cannot be construed so broadly as to prohibit the insured's counsel from making tactical decisions, such as those at issue here, which are part of a reasonable litigation strategy intended to decrease the likelihood of liability on the part of the insured."[235]

Mid-Continent's attempt to use PSI's post-occurrence litigation decision as a blanket bar to coverage in the framework of assessment of the Policy's scope of coverage undermines each of these other contractual provisions and legal doctrines, which balance the competing interests of the insured and insurer. As explained above, Mid-Continent will have the opportunity at trial on the cooperation clause to challenge the reasonableness of PSI's litigation decision.[236]

Ultimately, the Titeflex Judgment is based on the applicability of Section 82.002 in the State Court Litigation. Titeflex could invoke that statute because Head sued Titeflex because the property damage to his land gave rise to product liability claims. The genesis of the Titeflex Judgment was the property damage. While a sequence of events in litigation led to Titeflex's success on its Counterclaim, Mid-Continent's narrow view of the cause of the Titeflex Judgment draws an artificial dividing line.[237] But for the property damage, which caused

---

[235]    *Id.*

[236]    Mid-Continent's reliance on *Trevino*, 202 S.W.3d 811, reinforces the Court's conclusion. *See* Mid-Continent Reply [Doc. # 74], at 7. *Trevino* addressed the duty to cooperate. *See supra* Section III.C (analyzing PSI's duty to cooperate).

[237]    It is possible that Titeflex sued PSI because Mid-Continent urged PSI to sue Titeflex as part of its strategy for the State Court Litigation. *See* Exh. 14 to PSI Motion, Letter from Michael A. McGurk to Vicinaiz, dated Sept. 26, 2006 [Doc. # 63-16] (inquiry from PSI's independent counsel regarding whether Mid-Continent had decided to add Titeflex as a third-party defendant); Exh. 16 to PSI Motion, Email from Robert Bryant to Vicinaiz, dated Sept. 26, 2006 [Doc. # 63-18] (direction from Mid-Continent's claim representative to Vicinaiz to add Titeflex as third-party defendant for contribution). Recovery on the Affirmative
(continued…)

Head to file suit against Titeflex, there would have been no Section 82.002 claim giving rise to the Titeflex Judgment.

**Waiver, Collateral Estoppel, and Concurrent Causation.—** As explained above, the Section 82.002(a) portion of the Titeflex Judgment was incurred during the period the Head claim against Titeflex was pending. In its post-argument brief, Mid-Continent contends that these fees and expenses were incurred by Titeflex in defense of PSI's Affirmative Claim as well as Head's claim. PSI contends that Mid-Continent is bound by the Texas Court of Appeals' holding that the distinction between Titeflex's losses attributable to PSI and Head's respective claims was waived at trial in the State Court Litigation.[238] Mid-Continent objects to coverage on the ground that the defense against PSI's Affirmative Claim is a "concurrent cause" of the Titeflex Judgment that is not covered under the Policy.[239] The Court addresses each issue in turn.

PSI asserts that any allocation of attorneys' fees and costs within the Titeflex Judgment is improper because Mid-Continent, through the counsel it chose to defend PSI in the State Court Litigation, waived the right to segregate the fees in that litigation and this waiver should apply for all purposes.[240] Thus, PSI maintains

---

(continued...)

Claim might have inured to Mid-Continent's benefit. *See Graco*, 47 S.W.3d at 746–47 (holding that the innocent seller's insurer may assert the seller's Section 82.002 cause of action to recover its legal fees).

[238] *See supra* note 93 and accompanying text.

[239] *See* Mid-Continent Post-Argument Brief [Doc. # 90], at 3–6.

[240] *See Burton v. Nat'l Bank of Commerce of Dallas*, 679 S.W.2d 115, 118 (Tex. App.—Dallas 1984, no writ) ("[O]nce a right is waived, such right is lost forever and cannot be reclaimed without the consent of the other party." (citing *Witt v. Universal Auto. Ins. Co.*, 116 S.W.2d 1095 (Tex. App.—Waco 1938, writ dism'd))); *see also Songer v. Clement*, 20 S.W.3d 188, 193–94 (Tex. App.—
(continued...)

that Mid-Continent is now collaterally estopped from seeking such segregation in this coverage suit.    Mid-Continent counters that the Texas Court of Appeals' holding that PSI waived any argument seeking to distinguish between Titeflex's losses attributable to PSI and to Head's respective claims is insufficient for application of collateral estoppel.[241]  It is noted, however, that Mid-Continent cites no Texas authority on collateral estoppel to support its contention.[242]

After considering the parties' contentions and evidence, the Court concludes that the legal issue of whether Mid-Continent is bound by the waiver in the State

---

(continued…)
Texarkana 2000, no pet.) ("A waiver, by its nature, is a relinquishment of a right. It is not reinstated by a new trial or mistrial.").

[241]  *See* Mid-Continent Recon. Reply [Doc. # 103], at 4–5, ¶ 6.  Mid-Continent also argues that the disputed issue in this coverage dispute is not identical to the issues litigated in the State Court Litigation because it is not among the four questions submitted to the jury regarding the Titeflex Counterclaim.  *See* Mid-Continent Recon. Reply [Doc. # 103] (quoting Exh. A46 to Mid-Continent Motion, Court's Charge to the Jury, *Bill Head v. Petroleum Sols., Inc.*, Cause No. C-416-06-I (398th Dist. Ct., Hidalgo County, Tex. Nov. 5, 2008) [Doc. # 68-50], at 32–34 (Questions 13–16)).  PSI does not argue that the distinction between Titeflex's losses attributable to PSI's Affirmative Claim under Section 82.002(a) and Head's products liability claims against Titeflex was expressly presented.  Instead, PSI contends that the issue was implicitly but necessarily decided by the jury because the jury awarded the entire sum sought.  *See* PSI Recon. Reply [Doc. # 101], at 10.

[242]  It appears that Texas law applies.  *Weaver v. Tex. Capital Bank N.A.*, 660 F.3d 900, 906 (5th Cir. 2011) ("In determining the preclusive effect of an earlier state court judgment, federal courts apply the preclusion law of the state that rendered the judgment." (citing *Marrese v. Am. Acad. of Orthopaedic Surgeons*, 470 U.S. 373, 381 (1985))).

Substantively, the Tenth Circuit recently held that "[a] finding that an issue of fact or law is waived" is not sufficient to fulfill the requirement under *federal* law of collateral estoppel that an issue be "actually litigated."  *See In re Zwanziger*, 741 F.3d 74, 77 (10th Cir. 2014).  The complexity of the issue is highlighted by the *In re Zwanziger* dissent, which made forceful points in favor of the contrary result that a waiver does satisfy the "actually litigated" prong.  *See id.*, at 79–81 (Holloway, J., dissenting).

Court Litigation cannot be resolved as a matter of law on the current record.  To assess the issue of waiver and PSI's requested estoppel, there must be a trial to determine the parties' relationship and the events specifically related to the decision in state court not to seek segregation among the fees claimed by Titeflex. The argument by counsel and the deposition testimony of record are insufficient. Any ruling at this juncture would be an advisory opinion.  For instance, there are issues whether Mid-Continent, in exercising its right to defend the insured, PSI, in the State Court Litigation, held full responsibility for the strategic decisions and omissions in that litigation, and whether the absence of a request at trial for segregation was intentional, inadvertent, or by agreement with PSI.[243]   These circumstances must be explored at trial with the aid of meaningful briefing on Texas law of collateral estoppel.[244]

---

[243]   The summary judgment record gives some indication that Mid-Continent took the lead role in determining litigation strategy throughout the State Court Litigation. *Compare* Exh. A21 to Mid-Continent Motion, Letter from Michael A. McGurk to Victor Vicinaiz, dated Sept. 26, 2006 [Doc. # 68-25] (PSI's independent counsel inquiring as to whether a decision had been made about adding Titeflex as a third party in the State Court Litigation), *with* Exh. A20 to Mid-Continent Motion, Status Report (Mid-Continent Inter-Office Correspondence), dated Sept. 26, 2006 [Doc. # 68-24] ("October 6, 2006 is the deadline to join responsible parties. *We have instructed* defense counsel to add the flex connector manufacturer, TiteFlex, as well as the manufacturer of the leak detection system." (emphasis added)); *see also, e.g.*, Exh. 41 to PSI Motion, Email from Victor Vicinaiz to Robert Barron, dated Oct. 3, 3008 [Doc. # 63-43].  But, the Court does not make a factual finding in this regard.

[244]   The issues of waiver and collateral estoppel do not implicate the distinction between fees and costs incurred pursuant to Section 82.002 subsection (a) and those recoverable under subsection (g). No issue in the State Court Litigation required determination of that allocation.  Therefore, this issue was not necessarily decided nor waived in the liability litigation.  The issue of whether fee-shifting under Section 82.002(g) is classifiable as "damages" under Texas state law was presented for the first time in this coverage dispute.

The concurrent causation doctrine requires that, "[w]hen covered and excluded perils combine to cause an injury, the insured must present some evidence affording the jury a reasonable basis on which to allocate the damage."[245] Mid-Continent argues that the presence of a contributing cause that is not expressly *included* in the Policy is sufficient to defeat coverage. Mid-Continent relies on two cases that involve "named peril" property insurance policies, however, not an "all-risks" policy, as presented here.[246] Mid-Continent's argument is unavailing.

The concurrent causation doctrine is a function of an insured's fundamental burden of proof to demonstrate that damages for which coverage is sought are within the scope of the policy. There are significant differences between an insured's burden under a "named peril" policy and under an "all-risks" policy. Named peril policies "cover[] losses caused by specified perils; to the extent not specified, no coverage results."[247] Under an "all-risk" policy, coverage is "allowed for fortuitous losses unless the loss is excluded by a specific policy provision; the effect of such a policy is to broaden coverage . . . ."[248] Accordingly, Mid-Continent's named peril authorities are not persuasive. At best, they reinforce

---

[245]   *Lyons v. Millers Cas. Ins. Co. of Tex.*, 866 S.W.2d 597, 601 (Tex. 1993).

[246]   *See Poteet v. Kaiser*, No. 2-06-397-cv, 2007 WL 4371359, at *1 (Tex. App.—Fort Worth Dec. 13, 2007, pet. denied) (homeowners' insurance policy offering coverage for "sudden and accidental damage from smoke"); *Kelly v. Travelers Lloyds of Tex. Ins. Co.*, No. 14-05-00825-cv, 2007 WL 527911, at *3 (Tex. App.—Houston [14th Dist.] Feb. 22, 2007) ("Under their homeowners' policy, the Kellys' claim for personal property damage under Coverage B required proof of 'physical loss' to their personal property caused by a *named peril*." (emphasis added)).

[247]   10A COUCH ON INSURANCE § 148:48 (3d ed. 2016).

[248]   *Id.*, § 148:50.

PSI's threshold obligation to demonstrate the loss is within Policy section I(A)(1)(a)'s scope of coverage.

Mid-Continent has not argued that Titeflex's defense of PSI's claims are an *excluded* cause.[249]  The record indicates that all or a majority of the attorney's fees Titeflex incurred in defending against Head's claims were for services inextricably intertwined with its defense against PSI's Affirmative Claim throughout the relevant period.[250]  While Mid-Continent has pointed to evidence that certain time

---

[249]  The authorities on which Mid-Continent relies involved coverage disputes in which an explicitly excluded cause had been shown to apply.  *See, e.g.*, *Nat'l Union Fire Ins. Co. of Pittsburgh, Pa. v. Puget Plastics Corp.*, 649 F. Supp. 2d 613, 646–52 (S.D. Tex. 2009) (CGL policy, impaired property exclusion); *Lyons*, 866 S.W.2d at 599 (homeowner's insurance, foundation settlement exclusion); *Travelers Indem. Co. v. McKillip*, 469 S.W.2d 160, 163 (Tex. 1971) (windstorm coverage, snowstorm exclusion); *All Saints Catholic Church v. United Nat'l Life Ins. Co.*, 257 S.W.3d 800 (Tex. App.—Dallas 2008, no pet.) (commercial property insurance, latent defect and wear and tear exclusions); *Comsys Info. Tech. Servs. v. Twin City Fire Ins. Co.*, 130 S.W.3d 181, 198–200 (Tex. App.—Houston [14th Dist.] 2003, pet. denied) (errors and omissions policy, intentional acts exclusion); *Wallis v. United Servs. Auto. Ass'n*, 2 S.W.3d 300, 304 (Tex. App.—San Antonio 1999, pet. denied) (homeowners' insurance, earthquake, landslide, and earth movement exclusion).

[250]  At trial in state court, counsel for Titeflex testified that the fees incurred in defense of Head's claims and in defense of PSI's claims were "intertwined."  *See Petroleum Sols., Inc. v. Head*, 454 S.W.3d 518, 578 (Tex. App.—Corpus Christi 2011), *aff'd in part, rev'd in part*, 454 S.W.3d 482 (Tex. 2014).  Indeed, Titeflex's development of the spoliation sanctions strategy against PSI appears to have prompted Head to dismiss his claims against Titeflex and focus on PSI.  *See* Exh. A26 to Mid-Continent Motion, Defendant's, Titeflex Corporation, Motion for Sanctions for Spoliation of Evidence, *Bill Head v. Petroleum Sols., Inc.*, Cause No. C-416-06-I (398th Dist. Ct., Hidalgo County, Tex. Jan. 4, 2008) [Doc. # 68-30]; Exh. A28 to Mid-Continent Motion, Plaintiff's Notice of Non-Suit Without Prejudice of Third-Party/Defendant Titeflex Corporation, *Bill Head v. Petroleum Sols., Inc.*, Cause No. C-416-06-I (398th Dist. Ct., Hidalgo County, Tex. Mar. 7, 2008) [Doc. # 68-32].  Titeflex's fees, to this extent, at least, appear to have been incurred in defense of Head's products liability claim and ultimately resulted in Head dismissing that claim against Titeflex.  The fact that the work was also

(continued…)

entries indicate work done in defense of PSI's claims,[251] the entries do not suggest that the fees were incurred in connection with an excluded cause.     Mid-Continent's contentions regarding the doctrine of concurrent causation are rejected.

There remains, however, a genuine issue of material fact regarding exactly what fees and expenses Titeflex incurred in defense of Head's claims.[252]   To the extent fees or expenses were for work defending against Head's claims, which work was also helpful in countering PSI's claims, the sums are recoverable and are not barred by the concurrent cause doctrine.   To the extent fees were incurred solely in defense of PSI's Affirmative Claim, which claim was brought under Section 82.002 for indemnity and was not a product liability claim, the award to Titeflex was not "damages" under the Policy "because of" "property damage" to Head's land.   The parties may present testimony at trial regarding the purpose of specific challenged fees and costs incurred by Titeflex.   It is noted that if the Court finds Mid-Continent waived the segregation issue under Section 82.002(a) for purposes of this coverage action, then this factual inquiry is moot.

### c.     Conclusion on Coverage for "Damages Because of . . . 'Property Damage'"

The Policy covers the portion of the Titeflex Judgment awarded under Section 82.002(a) because "those [are] sums that [PSI has] become[] legally

_____

(continued…)

beneficial in defending against PSI's Affirmative Claim is immaterial because Titeflex's legal strategy during the relevant period was equally applicable to both Head and PSI's claims against it.

[251]   *See* Mid-Continent Recon. Motion [Doc. # 99], at 6 & nn.22, 23.

[252]   As noted, the Court does not decide at this time the issue of whether fees incurred during the periods of time that only PSI's Affirmative Claim was pending against Titeflex should be included.   That issue will turn on whether there was a waiver that estops Mid-Continent from challenging that allocation.

obligated to pay as damages because of . . . 'property damage' to which this insurance applies."  The Court next addresses PSI's alternative argument that the entirety of the Titeflex Judgment is covered as Money Damages under the Professional Liability Endorsement.

### 3.    Money Damages

PSI argues, in the alternative to coverage of the Titeflex Judgment as "damages because of . . . property damage," that the Professional Liability Endorsement creates coverage for "Money Damages" arising out of professional services.  The Endorsement includes "Money Damages" in its definition of an occurrence and adds to the Policy a definition of the term "Money Damages."[253] The Court first examines whether the Titeflex Judgment meets the definition of "Money Damages," before turning to whether it is covered by the parties' insuring agreement.  The Court concludes that the entire Titeflex Judgment does constitute "Money Damages," but, reading the Policy including the Professional Liability Endorsement as a whole, the Endorsement does not provide coverage to PSI for the Titeflex Judgment as "Money Damages."

### a.    Definition of "Money Damages"

Money Damages are defined broadly by the Professional Liability Endorsement as "a monetary judgment, award, or settlement."[254]  The definition of Money Damages is broader than the general meaning of "damages" under Texas law, which is restricted to damages for a substantive cause of action.[255]  Both the

---

[253]    Policy [Doc. # 63-2], at ECF page 40, § I(A)(1)(d-*bis*), § V(20).

[254]    Policy [Doc. # 63-2], at ECF page 40, § V(20).  The definition of Money Damages excludes certain forms of damages, such as "punitive or exemplary damages," *see id.*, § V(20)(a)–(c), but those exceptions are not applicable to the Titeflex Judgment.

[255]    *See supra* Section IV.D.2.a.

Section 82.002(a) and (g) portions of the Titeflex Judgment fall within "Money Damages" because both constitute "monetary judgments." Although the Section 82.002(g) portion of the Titeflex Judgment is not covered as "damages" under Policy section I(A)(1)(a), the entire Titeflex Judgment fits within a literal interpretation of "monetary judgment" under the Professional Liability Endorsement. Both the Section 82.002(a) and (g) portions of the Titeflex Judgment therefore constitute "Money Damages."

### b.    Coverage for Money Damages

The parties dispute whether the Professional Liability Endorsement expands the Policy's coverage to include Money Damages independent of "'bodily injury' or 'property damage'." As a threshold matter, PSI's claim for coverage under the "Money Damages" provisions fails because the Professional Liability Endorsement does not explicitly amend the Insuring Agreement, section I(A)(1), to include "Money Damages." The Court also determines that even if the parties had intended such an amendment, coverage would be unavailable under the Policy. The Court concludes that the Endorsement fails to create a new insuring agreement to extend coverage to "Money Damages."

***Plain Meaning of the Insuring Agreement.***— The Professional Liability Endorsement introduces Money Damages as a term parallel to "property damage" and "bodily injury" within the Endorsement. The Insuring Agreement in section I(A)(1), however, is the seminal and only language granting insurance coverage within the provisions at issue. Under section I(A)(1)(a), coverage exists when "bodily injury" or "property damage" results from an "occurrence." The Endorsement does *not* say that those Money Damages are insured.[256] Thus, while

---

[256]    *Compare* Policy [Doc. # 63-2], at CGL Form page 1 (ECF page 14), § I(A)(1)(a) ("We [Mid-Continent] will pay those sums that the insured [PSI] becomes legally (continued…)

the Professional Liability Endorsement deems "Money Damages" to be *caused* by an "occurrence" when they arise out of the rendering of or failure to render professional services,[257] the Policy contains no language expanding the scope of the Policy's coverage to include "Money Damages" independent of and in addition to "damages because of 'bodily injury' or 'property damage.'"

The Professional Liability Endorsement only creates another definition of "occurrence" to address an additional avenue for coverage tied to "bodily injury" or "property damage" when these types of injury arise out of professional services. In particular, the Endorsement's alternative definition of "occurrence" does not require an "accident" as otherwise would be required by the Policy, section V(13). The Endorsement, by its terms, does not otherwise expand the scope of coverage granted by Policy section I(A)(1).[258]

Insured PSI agrees that "the Professional Liability Endorsement—by its own explicit reference to adding section d. to the insuring agreement—does not modify paragraph a. of the insuring agreement of the Policy to include the phrase 'Money

---

(continued…)

obligated to pay as damages because of *'bodily injury' or 'property damage'* to which this insurance applies." (emphasis added)), *and id.*, § I(A)(1)(b) ("This insurance applies to *'bodily injury' and 'property damage'* only if . . . ." (emphasis added)), *with id.*, at Professional Liability Endorsement page 1 (ECF page 40), § I(A)(1)(d-*bis*) ("'*Bodily Injury', 'Property Damage' or 'Money Damages'* arising out of the rendering or failure to render professional services shall be deemed to be caused by an 'occurrence.'" (emphasis added)).

[257] *See Jackson v. McKay-Davis Funeral Home, Inc.*, 717 F. Supp. 2d 809, 819 (E.D. Wis. 2010).

[258] *See id*. The Court rejects PSI's argument that, without coverage for Money Damages, the premiums for the Professional Liability Endorsement are tantamount to merely purchasing four additional exclusions to coverage. *See* Policy [Doc. # 63-2], at Professional Liability Endorsement page 1 (ECF page 40), § I(A)(2)(o-*bis*)–(r).

81

Damages.'" [259]  PSI argues, however, that the Policy merely "require[s] a showing of 'Property Damage' during the Policy Period as set forth in paragraph 1.b" to obtain coverage for "Money Damages." [260]  This interpretation is rejected as without basis in the text of the Policy.  "Money Damages" and "property damage" are alternatives that create separate and parallel inquiries within the Endorsement. While the Court concluded that there was "property damage" during the Policy Period, there is no grant of coverage for "Money Damages" [261] by reason of a finding of "property damage."

   ***Implied Amendment of the Insuring Agreement.***—Even if the Court were to imply "Money Damages" into the Insuring Agreement, section I(A)(1), wherever the Policy references "bodily injury" and "property damage," PSI's coverage claim nevertheless would fail.  The Money Damages coverage analysis would follow the steps of the foregoing analysis for coverage connected to the property damage. [262]  The first question is whether the Money Damages, here, the Titeflex Judgment, "are [Money Damages] to which this insurance applies."  As with the damage to Head's property, the framework here requires analysis of whether (1) the Money Damages were caused by an occurrence within the coverage territory, [263] (2) the Money Damages occurred during the Policy Period, [264] and (3) PSI had no prior knowledge of the Money Damages. [265]

---

[259]    *See* PSI Reply [Doc. # 72], at 23.

[260]    *See* PSI Sur-Reply [Doc. # 79-1], at 11–12.

[261]    As distinct from "damages" under section I(A)(1)(a).

[262]    *See supra* Sections IV.D.1–2.

[263]    *Compare supra* Section IV.D.1.b.

[264]    *Compare supra* Section IV.D.1.c.

[265]    *Compare supra* Section IV.D.1.d.

Under this methodology, the Titeflex Judgment cannot satisfy the Policy Period requirement as applied to "Money Damages."  The relevant date for the policy period applicable to property damage is the date on which the property damage occurs.  The relevant date for the policy period for Money Damages thus is the date on which the Money Damages occur.  The Titeflex Judgment was rendered on September 29, 2008, far outside the Policy Period of May 1, 2001 to May 1, 2002.[266]   Therefore, it is unnecessary to determine whether the parties intended to amend the Insuring Agreement.

*Professional Liability Endorsement as a Separate Grant of Coverage.*— PSI seeks summary judgment contending that the Professional Liability Endorsement creates freestanding coverage for all Money Damages under the Policy, thus including the entire Titeflex Judgment.  PSI urges that the Professional Liability Endorsement does *not* alter section I(A)(1)(a).[267]  PSI instead contends, "[b]y its own language . . . the 'Professional Liability Endorsement' is its own *separate grant of coverage* insofar as it grants coverage for 'Bodily Injury, Property Damage, or Money Damages arising out of the rendering or failure to

---

[266]    PSI argues that it may still prevail because it maintained CGL coverage under substantially similar Mid-Continent policies in 2008 and 2009.  *See* PSI Reply [Doc. # 72], at 27.  That argument is rejected because PSI's Counterclaim only alleges coverage under the 2001–2002 Policy.  *See* Defendant's Answer to Second Amended Complaint for Declaratory Judgment and Counterclaim [Doc. # 51], at 5, ¶ 38 (defining the "Policy" for the purposes of the Counterclaim as Policy No. 04-GL-000051591, "which was in effect from May 1, 2001 to May 1, 2002"); *id.*, at 10, ¶ 67 (claiming that Mid-Continent is liable for breach of contract because "Titeflex's claims and subsequent judgment fall within the coverage afforded by the Policy").

[267]    *See* PSI Reply [Doc. # 72], at 23.

render professional services.'"[268]  This contention is not supported by the Policy or the Endorsement language.[269]

PSI advocates an unjustifiably expansive reading of the Professional Liability Endorsement.  PSI seeks to convert the definition of "occurrence" into a freestanding grant of coverage for Money Damages arising out of the rendering of or failure to render professional services, without regard for when or how the Money Damages occurred, regardless if an insured was legally obligated to pay them, and regardless of any Policy exclusion.[270]  The coverage PSI advocates

---

[268]   PSI Reply [Doc. # 72], at 12 (emphasis added).

[269]   PSI cites the Fifth Circuit's decision in *Davis-Ruiz Corp. v. Mid-Continent Casualty Co.*, 281 F. App'x 267 (5th Cir. 2008), for the proposition that the coverage created by the Endorsement cannot be "illusory."  *See id.*, at 274.  Although the insuring agreement section was identical to Policy section I(A)(1)(a) in this case, *see* 281 F. App'x at 270 n.2, the professional liability endorsement in that case covered only "bodily injury" or "property damage," and did not introduce the concept of "Money Damages."  *See* Exh. 56 to PSI Motion (Appendix to PSI Supplemental Brief), Excerpt of Copy of Mid-Continent Casualty Company Policy No. 04-GL-000090137, CGL Policy for Davis-Ruiz Corp. [Doc. # 86-2].  The Fifth Circuit merely held that one of the policy's exclusions could not be interpreted so broadly that it would nullify the additional coverage under the professional liability endorsement.  *See* 281 F. App'x at 274.  Nowhere did the *Davis-Ruiz* court hold that the endorsement was a stand-alone insuring agreement.

[270]   Under PSI's interpretation, nothing in the Endorsement links "Money Damages" to the phrase "to which this insurance applies" in section I(A)(1)(a), which is necessary to the application of this occurrence-based policy to specific incidents by defining the coverage territory, the policy period, and exclusions to coverage.  *See* Policy [Doc. # 63-2], at CGL Form page 1 (ECF page 14), § I(A)(1)(b)(2) (stating that "this insurance applies to 'bodily injury' and 'property damage' only if" it is caused by an occurrence within the coverage territory during the policy period); *id.*, § I(A)(2) (stating "[t]his insurance does not apply to" a list of exclusions to coverage).  The Court cannot imply additional provisions to circumscribe the purported freestanding coverage for Money Damages.  *United Nat'l Ins. Co. v. Mundell Terminal Servs., Inc.*, 740 F.3d 1022, 1027 (5th Cir. 2014) (noting that Texas insurance law does not permit court to "remake [the

(continued…)

84

would create cascading interpretive problems.  PSI argues that the parties did not intend the purported coverage of Money Damages under the Endorsement to be tethered to a policy period.  This construction of the Endorsement is without precedent and is rejected.  Indeed, the parties' agreement to substantively identical professional liability endorsements for later policy years with virtually identical insuring agreements demonstrates intent to tie the Professional Liability Endorsement in 2001–2002 to that Policy year.[271]

---

(continued…)

parties'] contract by reading additional provisions into it" (quoting *Gilbert Tex. Constr., L.P. v. Underwriters at Lloyd's London*, 327 S.W.3d 118, 126 (Tex. 2010))); *see also* PSI Reply [Doc. # 72], at 25 (stating that "adding language to the Policy that does not exist . . . is in contravention of well-established Texas law"). The arguments in PSI's proposed Sur-Reply [Doc. # 79-1], at 10, are similarly unconvincing.

[271]   *See* Exh. 48 to PSI Motion, Certified Copy of Mid-Continent Casualty Company Policy No. 04-GL-635492  [Doc. # 72-5], at ECF page 9, [Doc. # 72-6], at ECF page 27; Exh. 49 to PSI Motion, Certified Copy of Mid-Continent Casualty Company Policy No. 04-GL-678112 [Doc. # 72-8], at ECF page 13, [Doc. # 72-9], at ECF page 33; Exh. 50 to PSI Motion, Certified Copy of Mid-Continent Casualty Company Policy No. 04-GL-720124 [Doc. # 72-14], at ECF page 17, [Doc. # 72-15], at ECF page 37.

It is noted that Mid-Continent's position that the Professional Liability Endorsement offers absolutely no coverage for Money Damages is also problematic.  Mid-Continent's interpretation renders superfluous the definition of "occurrence" based on Money Damages and the addition of Money Damages to the "Definitions" section of the Policy.  Rules of contract construction counsel against interpretations that make clauses meaningless.  *See, e.g.*, *In re Deepwater Horizon*, 470 S.W.3d 452, 464 (Tex. 2015) (explaining court should "seek[] to harmonize all provisions and render none meaningless" in interpreting insurance contracts (quoting *Gilbert Tex. Constr., L.P. v. Underwriters at Lloyd's London*, 327 S.W.3d 118, 126 (Tex. 2010)).  Mid-Continent offers no explanation for why the parties went to the trouble of including "Money Damages" in the new section I(A)(1)(d-*bis*) and adding a specific definition of that term.  Had PSI sued under the 2008–2009 Policy, there would be a question regarding whether the addition of the definition of occurrence based on Money Damages altered the scope of the

(continued…)

### 4.     Exclusion q.

Mid-Continent argues that even if the Titeflex Judgment is within the scope of the Insuring Agreement in section I(A)(1), it is excluded from coverage by section I(A)(2)(q) ("Exclusion q").[272]  Exclusion q precludes coverage for any

> Loss caused intentionally by or at the direction of the insured; or any dishonest, fraudulent, criminal, malicious and knowingly wrongful acts.

Mid-Continent contends that PSI's rejection of the Settlement Offer was an intentional act that caused the loss.   Mid-Continent's argument regarding Exclusion q is a repackaging of its duty to cooperate argument as part of the initial coverage analysis.[273]  This approach is contrary to the Policy language.[274]  Mid-Continent has therefore failed to carry its burden of showing that Exclusion q applies.

### 5.     Public Policy

Based on Fifth Circuit authority that "the CGL policy language 'legally obligated to pay as damages' applies only to tort-based obligations,"[275] Mid-Continent argues that the Court should not find "coverage under the Policy for

---

(continued…)

Insuring Agreement.  The Court does not reach this question because PSI sued only under the 2001–2002 Policy.  *See supra* note 266.

[272]     Policy  [Doc. # 63-2], at ECF page 40, § I(A)(2)(q).

[273]     *See supra* IV.C.

[274]     *See supra* Section IV.D.2.b, at 68–73.

[275]     Mid-Continent acknowledges that intervening rulings by the Texas Supreme Court have cast doubt on the validity of this authority.  *See* Mid-Continent Recon. Motion [Doc. # 99], at 7 n.26 (citing *Lamar Homes, Inc. v. Mid-Continent Cas. Co.*, 242 S.W.3d 1, 13 (Tex. 2007)).  It is unnecessary to resolve that issue.  *See infra* note 277.

statutory indemnity, which is not a tort-based claim."[276]   Mid-Continent's argument misapprehends the relationship of the Titeflex Judgment to the grant of coverage.   This case arises out of an alleged tort-based obligation, namely, Head's allegation that PSI installed a defective fuel storage system that damaged Head's property.   The Titeflex Judgment is covered as a species of consequential damages flowing from this underlying tort cause of action.[277]

Mid-Continent's reliance on this Court's decision in *Acceptance Indemnity Insurance Co. v. Maltez* also is misplaced.[278]   Mid-Continent argues that "there is a strong public policy against requiring insurers to pay for damages caused by risks never considered," which public policy a finding of coverage would contravene by "requir[ing] an insurer to pay for losses a third-party incurs in defense of a fourth-party's claims."[279]   First, it is noted that *Maltez* is not binding authority.   Second, the question presented in *Maltez* was not whether the insured party sought coverage for a *type* of risk the parties had not considered.   Instead, *Maltez* involved an effort by an uninsured corporate entity to obtain coverage under the theory that it operated as a "single business enterprise" with the named insured corporate entity.[280]   The "single business enterprise" doctrine is a form of corporate veil-piercing.[281]   The "risks never considered" about which the Court was concerned

---

[276]   Mid-Continent Recon. Motion [Doc. # 99], at 7.

[277]   The Court therefore does not reach whether Mid-Continent's argument correctly characterizes current Texas law.

[278]   Mid-Continent Recon. Motion [Doc. # 99], at 7–8 (discussing *Acceptance Indem. Ins. Co. v. Maltez*, 619 F. Supp. 2d 289 (S.D. Tex. 2008) (Atlas, J.)).

[279]   *Id.*, at 7.

[280]   *See* 619 F. Supp. 2d at 299–304.

[281]   In *Maltez*, the Court explained that the "single business enterprise" doctrine was not widely accepted.  *Id.*, at 299–300.

were the risks associated with the uninsured entity that sought coverage, which entity was not an additional insured and could not have been analyzed in the calculation of the policy premiums for the named insured.[282]

Here, Mid-Continent argues that it should not be liable for coverage because it did not consider the possibility that an award of attorney's fees under Section 82.002(a) would be within the scope of coverage.[283]   Essentially, Mid-Continent argues that the Titeflex Judgment should not be covered because Mid-Continent failed to anticipate the specific factual circumstance that has arisen.   The Court's conclusion in *Maltez* depended on the true unforeseeability to the insurer of the risks associated with a business enterprise that was not a named insured and that had not been disclosed to the insurer.   In contrast, coverage of a Section 82.002 indemnification obligation was foreseeable, but Mid-Continent apparently failed to perceive that this cause of action would be within the insuring agreement it drafted. It is not uncommon for an insurer to be contractually bound to provide coverage to a named insured for a particular injury the insurer did not foresee.   Mid-Continent provides no binding authority for an exception in this regard.

---

[282]   *Id.*, at 303–04.

[283]   Mid-Continent contends that a finding of coverage "requires the insurer to pay for losses a third-party incurs in defense of a fourth-party's claims."   *See* Mid-Continent Recon. Motion [Doc. # 99], at 7.   This characterization of the Court's holding overlooks the specific context of Section 82.002.   Section 82.002 creates a cause of action that classifies costs in defense of an injured plaintiff's products liability claim as a claim for damages.   Mid-Continent identifies no other statutes or common law causes of action that would lead to the expanded universe of coverage it describes.   *See* Mid-Continent Recon. Motion [Doc. # 99], at 7. Section 82.002 had been in existence for nearly a decade when Mid-Continent issued the Policy, so Mid-Continent could have considered whether its Policy provided coverage for that indemnification obligation when selling CGL coverage to product manufacturers.

### 6.    Conclusion on Coverage

PSI has carried its burden to establish that the Policy provides coverage for part of the Titeflex Judgment.  The portion of the Titeflex Judgment awarded pursuant to Section 82.002(a) falls within the scope of "damages because of" the "property damage" that occurred on Head's property.  The portion of the Titeflex Judgment awarded pursuant to the fee-shifting provision of Section 82.002(g), however, does not constitute "damages" and is not covered by the Policy.  The Professional Liability Endorsement's "Money Damages" provision does not apply because any Money Damages-based occurrence happened outside the Policy Period.  Therefore, only the Section 82.002(a) portion of the Titeflex Judgment, approximately $150,000, is within the scope of the Policy's Insuring Agreement.[284]

### E.    Texas Insurance Code

PSI claims that Mid-Continent violated the Texas Insurance Code, § 541.060(a)(4), by "failing within a reasonable time to" either "affirm or deny coverage of a claim to a policyholder" or "submit a reservation of rights to a policyholder."[285]  This contention is without merit.  The record demonstrates that Mid-Continent apprised PSI that it might rely on the cooperation clause to deny coverage as early as August 26, 2008, eleven days after PSI rejected the Settlement Offer, and clarified that this coverage position applied to the Titeflex Counterclaim

---

[284]    This conclusion does not resolve the threshold question on which there is a genuine fact issue: whether PSI met its duty to cooperate with Mid-Continent when declining to settle the entire Titeflex lawsuit by abandoning its Affirmative Claim with prejudice, *see supra* Section IV.C, or whether Mid-Continent is estopped from arguing the Section 82.002(a) damages do not include fees, expenses and costs attributable to Titeflex's defense of PSI's Affirmative Claim before and after Head's claims against Titeflex were pending, *see supra* notes 238 and 240-244, and accompanying text, in Section IV.D.2.b.

[285]    TEXAS INS. CODE § 541.060(a)(4)(A)–(B).

on September 19, 2008.[286]   Mid-Continent issued a denial letter less than three weeks after the Texas Supreme Court affirmed the Titeflex Judgment in July of 2014, which letter referenced Exclusion q as an additional basis for denial of coverage.[287]   As PSI concedes, there are no "magic words" required for an effective reservation of rights.[288]   PSI has cited no authority that permits the conclusion that Mid-Continent's communications violate the Texas Insurance Code.   Summary judgment is **granted** in favor of Mid-Continent on PSI's claim under Chapter 541 of the Texas Insurance Code.

Further, because PSI has no viable claim under § 541.060 of the Texas Insurance Code, its request for attorney's fees pursuant to § 541.152 necessarily fails.[289]

### F.   Section 38.001 Attorney's Fees Request

PSI also requests an award of attorney's pursuant to § 38.001 of the Texas Civil Practice and Remedies Code.   Section 38.001(8) permits a party to recover reasonable attorney's fees on a successful claim for breach of contract.[290]   Because

---

[286]   Exh. A40 to Mid-Continent Motion, Letter from Rod Evans to Mark Barron, dated Aug. 26, 2008 [Doc. # 68-44], at 7; Exh. A43 to Mid-Continent Motion, Letter from Rod Evans to Mark Barron, dated Sept. 19, 2008 [Doc. # 68-47], at 1 ("The Counter Claim of Titeflex Corporation against PSI is part of the suit for which Mid-Continent has presently agreed to provide coverage subject to a reservation of rights. . . .   We believe our coverage position letter of August 26, 2008 is sufficient to also address the Counter Claim of Titeflex Corporation against PSI . . . .").

[287]   Exh. A47 to Mid-Continent Motion, Letter from Robert Glover to Mark Barron, dated July 30, 2014 [Doc. # 63-51], at 5.

[288]   *See* PSI Reply [Doc. # 72], at 48 (citing *Nutmeg Ins. Co. v. Clear Lake City Water Auth.*, 229 F. Supp. 2d 668, 694 (S.D. Tex. 2002) (Harmon, J.)).

[289]   *See* TEX. INS. CODE § 541.152(a) (permitting fee-shifting only for "a plaintiff who *prevails* in an action under this subchapter" (emphasis added)).

[290]   Mid-Continent argues that it is exempted from § 38.001 by an exception in Section 38.006 of the same chapter.   *See* Mid-Continent Motion [Doc. # 68-1], at 46 & (continued…)

there is a genuine issue of material fact regarding the duty to cooperate, PSI has not yet succeeded on its claim for breach of contract.  Summary judgment is **denied** to both parties on PSI's claim for attorney's fees.

## V.    CONCLUSION AND ORDER

Under the terms of the Policy at issue, the Court concludes that the Texas statutory indemnification obligation under Texas Civil Practice and Remedies Code Section 82.002(a) is within the scope of coverage under the product manufacturer's CGL Policy's Insuring Agreement, but that an award to that seller of fees, expenses and costs incurred in prosecuting that indemnity claim pursuant to Section 82.002(g) are not covered.

The Court further holds that the Policy's Professional Liability Endorsement does not create an independent insuring agreement that alters this result, and PSI's claim for "Money Damages" included within the Endorsement is not covered by the policy period in suit.

The Court also concludes with regard to the Policy's cooperation clause that Mid-Continent has shown prejudice as a matter of law resulting from PSI's rejection of the Titeflex Settlement Offer for mutual dismissals with prejudice of all claims between PSI and Titeflex.  There exists, however, a genuine question of material fact for trial regarding whether PSI was reasonable in declining to accept Titeflex's global Settlement Offer and agree to mutual releases with prejudice.

---

(continued…)
n.244 (citing *Bituminous Cas. Corp. v. Vacuum Tanks, Inc.*, 75 F.3d 1048, 1056 (5th Cir. 1996)).   Mid-Continent's proffered interpretation of § 38.006 was squarely rejected by the Texas Supreme Court in *Grapevine Excavation, Inc. v. Maryland Lloyds*, 35 S.W.3d 1 (Tex. 2001), which abrogates the Fifth Circuit's interpretation of Texas law in *Bituminous Casualty*.  *See Hughes v. Tobacco Inst., Inc.*, 278 F.3d 417, 421 (5th Cir. 2001) (noting that the Fifth Circuit's interpretation of Texas law is binding on a district court, unless a subsequent state court decision renders its prior decision clearly wrong).

Furthermore, the Court concludes that triable issues of fact exist regarding:

1.      Whether, for purposes of this coverage case, any waiver by counsel for PSI in the State Court Litigation of the allocation of Titeflex's losses attributable, respectively, to either PSI or Head's claims against Titeflex collaterally estops Mid-Continent from objecting to Policy coverage in this suit attributable to Titeflex's losses incurred solely in connection with defending against PSI's Affirmative Claims; and

2.  (a)  if there is no waiver as a result of the State Court Litigation, the amounts within the Titeflex Judgment that are attributable to defense of solely Head's claims against Titeflex, or

          (b)  if there is a waiver as a result of the State Court Litigation, the amounts within the Titeflex Judgment attributable to defense of both Head's and PSI's claims against Titeflex.

Finally, the Court concludes that Policy Exclusion q and § 541.060(a)(4) of the Texas Insurance Code are inapplicable as a matter of law.

The Court recognizes that this case raises several novel and complex questions of Texas law.  Further guidance from the Texas Supreme Court would be valuable if appellate input is sought by the parties.

The Court does not reach the question of whether PSI is entitled to attorney's fees under Chapter 38 of the Texas Civil Practice and Remedies Code because PSI has not yet prevailed on its claim for breach of contract.  It is therefore

**ORDERED** Defendant's Motion for Leave to File a Sur-Reply [Doc. # 79] is **GRANTED** and the Proposed Sur-Reply [Doc. # 79-1] is deemed filed.  It is further

**ORDERED** that Plaintiff Mid-Continent Casualty Company's Objections to Petroleum Services, Inc.'s Summary Judgment Evidence [Doc. # 75] are **OVERRULED**.  It is further

**ORDERED** that Defendant Petroleum Solutions, Inc.'s Motion for Summary Judgment [Doc. # 62] is **GRANTED in part** in accordance with this Memorandum and Order and **DENIED** in all other respects.  It is further

**ORDERED** that Plaintiff Mid-Continent Casualty Co.'s Cross-Motion for Summary Judgment [Doc. # 68] is **GRANTED in part** as stated in this Memorandum and Order and **DENIED** in all other respects.  It is further

**ORDERED** that Defendant Petroleum Solutions, Inc.'s Motion to Amend or Alter [Doc. # 93] is **GRANTED in part** in accordance with this Memorandum and Order and **DENIED** in all other respects.  It is further

**ORDERED** that Plaintiff Mid-Continent Casualty Co.'s Motion to Amend or Alter the Court's Memorandum and Order [Doc. # 99] is **GRANTED in part** in accordance with this Memorandum and Order and **DENIED in all other respects**. It is further

**ORDERED** that the trial setting for October 19, 2016, is **VACATED**.  The Court will schedule a conference by separate order.

SIGNED at Houston, Texas, this___ day of **September, 2016**.

## APPENDIX

This Appendix includes relevant excerpts from the Policy.  The provisions are presented here in the order in which they appear in the Policy.  Provisions inserted by amendment have been combined with the original language of the Policy.  Where amendments to the Policy duplicated numbering of provisions in the original Policy text, the Court employs "-*bis*" to distinguish the provisions.

## SECTION I – COVERAGE, Coverage A. Bodily Injury and Property Damage Liability

**1.**     **Insuring Agreement:**

    **a.**     We will pay those sums that the insured becomes legally obligated to pay as damages because of "bodily injury" or "property damage" to which this insurance applies.  We will have the right and duty to defend the insured against any "suit" seeking those damages.  However, we will have no duty to defend the insured against any "suit" seeking damages for "bodily injury" or "property damage" to which this insurance does not apply.  We may, at our discretion, investigate any "occurrence" and settle any claim or "suit" that may result. . . .

* * * *

    **b.**     This insurance applies to "bodily injury" and "property damage" only if:

        (1) The "bodily injury" or "property damage" is caused by an "occurrence" that takes place in the "coverage territory";

        (2) The "bodily injury" or "property damage" occurs during the policy period; and

        (3) Prior to the policy period, no insured . . . knew that the "bodily injury" or "property damage" had occurred, in whole or in part. . . .

* * * *

    **d**.     "Bodily injury" or "property damage" will be deemed to have been known to have occurred at the earliest time when any insured listed under Paragraph 1. of Section II - Who Is An Insured or any "employee" authorized by you to give or receive notice of an "occurrence" or claim:

94

(1) Reports all, or any part, of the "bodily injury" or "property damage" to us or any other insurer;

(2) Receives a written or verbal demand or claim for damages because of the "bodily injury" or "property damage"; or

(3) Becomes aware by any other means that "bodily injury" or "property damage" has occurred or has begun to occur. [Added by the Amendment of Insuring Agreement – Known Injury or Damage]

* * * *

**d-*bis*.** "Bodily Injury", "Property Damage" or "Money Damages" arising out of the rendering or failure to render professional services shall be deemed to be caused by an "occurrence". [Added by the Professional Liability Endorsement]

**2.    Exclusions**

* * * *

**q.**    Loss caused intentionally by or at the direction of the insured; or any dishonest, fraudulent, criminal, malicious and knowingly wrongful acts.  [Added by the Professional Liability Endorsement]

* * * *

**Coverage B – Personal and Advertising Injury Liability**

* * * *

**Coverage C – Medical Payments**

* * * *

**SECTION IV – COMMERCIAL GENERAL LIABILITY CONDITIONS**

* * * *

**2.    Duties in The Event Of Occurrence, Offense, Claim or Suit**

* * * *

b.    If a claim is made or "suit" is brought against any insured, you must:

(1)    Immediately record the specifics of the claim or "suit" and the date received; and

(2)    Notify us as soon as practicable.

You must see to it that we receive written notice of the claim or "suit" as soon as practicable.

95

c.  You and any other involved insured must:

(1)  Immediately send us copies of any demands, notices, summonses or legal papers received in connection with the claim or "suit";

(2)  Authorize us to obtain records and other information;

(3)  Cooperate with us in the investigation or settlement of the claim or defense against the 'suit'; and

(4)  Assist us, upon our request, in the enforcement of any right against any person or organization which may be liable to the insured because of injury or damage to which this insurance may also apply.

d.  No insured will, except at that insured's own cost, voluntarily make a payment, assume any obligation, or incur any expense, other than for first aid, without our consent.

\* \* \* \*

## SECTION V – DEFINITIONS

\* \* \* \*

**13.**  "Occurrence" means an accident, including continuous or repeated exposure to substantially the same general harmful conditions.

\* \* \* \*

**17.**  "Property damage" means:

**a.**  Physical injury or tangible property, including all resulting loss of use of that property.  All such loss of use shall be deemed to occur at the time of the physical injury that caused it; or

**b.**  Loss of use of tangible property that is not physically injured.  All such loss of use shall be deemed to occur at the time of the "occurrence" that caused it.

**18.**  "Suit" means a civil proceeding in which damages because of "bodily injury", "property damage" or "personal and advertising injury" to which this insurance applies are alleged.  "Suit" includes:

**a.**  An arbitration proceeding in which such damages are claimed and to which the insured must submit or does submit with our consent; or

**b.**     Any other alternative dispute resolution proceeding in which such damages are claimed and to which the insured submits with our consent.

* * * *

**20.**   "Money Damages" means a monetary judgment, award, or settlement and does not include:

**a.**     Punitive or exemplary damages which are a multiple of compensatory damages or penalties;

**b.**     The restitution of compensation and expenses paid to you for services or goods;

**c.**     Judgments or awards arising from acts deemed uninsurable by law.

SIGNED at Houston, Texas, this <u>29th</u> day of September, 2016.


_____
NANCY F. ATLAS
SENIOR UNITED STATES DISTRICT JUDGE

P:\ORDERS\a2008-2009\2009\0422AmendedMSJ.docx  160928.1732